2010 UT 65

ASC UTAH, INC. dba The Canyons,
Plaintiff, Counterclaim Defendant
and Appellee,

v.

WOLF MOUNTAIN RESORTS, L.C.,
Defendant, Counterclaim Plaintiff
and Appellant.

Wolf Mountain Resorts, L.C., Plaintiff,

v.

ASC Utah, Inc. dba The Canyons,
Defendant.

Stephen A. Osguthorpe, et al., Plaintiffs,

v.

Wolf Mountain Resorts, L.C., Defendant.

Enoch Richard Smith, as the Personal
Representative of the Estate of
Enoch Smith, Jr., Intervenor.

Stephen A. Osguthorpe, et al, Plaintiffs,

v.

ASC Utah, Inc. dba The Canyons,
Defendant.

No. 20090599.

Supreme Court of Utah.

Nov. 19, 2010.

John P. Ashton, Clark K. Taylor, John R. Lund, Kara Pettit, Salt Lake City, for plaintiffs.

David M. Wahlquist, Ryan B. Frazier, Salt Lake City, Bruce C. Moore, Scott Mahady, Eugene, OR, for defendants.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 This case presents two issues: (1) whether the district court has jurisdiction to find that a party waived its contractual right of arbitration under Utah Code section 78–31a–4 (1996),[1] and (2) whether the district court erred in holding that Wolf Mountain waived any potential contractual right to arbitration. We hold that the district court has such jurisdiction, and that it was correct in holding that Wolf Mountain waived any potential contractual right to arbitration.

## BACKGROUND

¶ 2 On July 3, 1997, Wolf Mountain Resorts, L.C. (Wolf Mountain) and ASC Utah, Inc., dba The Canyons (ASCU) entered into a Ground Lease agreement (Ground Lease) concerning the property now known as "The Canyons Ski Resort" (The Canyons). In the Ground Lease, Wolf Mountain agreed to lease The Canyons to ASCU for up to 200

---

1. The legislature has since enacted the Utah Uniform Arbitration Act, Utah Code Ann. §§ 78B–11–101 to –131 (2008). Section 78B–11–104, however, notes that the new Act "applies to any agreement to arbitrate made on or after May 6, 2002," covering earlier agreements only if all parties so agree. Thus we cite to provisions of the earlier Utah Arbitration Act throughout this opinion.

years. The Ground Lease requires ASCU to make annual rent payments to Wolf Mountain, develop the property, and pay Wolf Mountain a percentage of the costs of development. As ASCU develops the property, the Ground Lease provides that ASCU may exercise an exclusive option to transfer title of the property from Wolf Mountain to ASCU.

¶ 3 In 1999, pursuant to the Ground Lease, ASCU, Wolf Mountain, Summit County, and various other landowners not participating in this litigation entered into an Amended and Restated Development Agreement for the Canyons Specially Planned Area (SPA Agreement). The SPA Agreement outlines how The Canyons will be developed. Since 1997, in accordance with the Ground Lease and SPA Agreement, ASCU has invested a significant amount of money in developing The Canyons, greatly increasing the number of skier visits each year. Wolf Mountain and ASCU, however, have had disputes about these agreements that have hindered the development of The Canyons, including impeding the construction of a golf course that had been contemplated in the SPA Agreement.

¶ 4 In March 2006, Wolf Mountain issued a Default Notice to ASCU, alleging that ASCU had breached terms of the Ground Lease and threatening to terminate the Ground Lease. In response, ASCU filed a Complaint seeking declaratory relief related to the Default Notice and successfully moved for a preliminary injunction. Soon after, ASCU filed its First Amended Complaint, claiming that Wolf Mountain had breached the Ground Lease, including its duties to assist in land development pursuant to the SPA Agreement, which the Ground Lease incorporates. Wolf Mountain responded by filing an Answer and Counterclaim, and a First Amended Complaint against ASCU in a separate action. That action and others were consolidated into this case. Since the fall of 2006, Wolf Mountain and ASCU have been actively engaged in litigation, including extensive discovery and pretrial motions.

¶ 5 This discovery included the exchange of copious quantities of written discovery, the issuance of subpoenas duces tecum, and the taking of over 32 depositions. Specifically, Wolf Mountain served ASCU with four sets of Requests for Production of Documents, containing more than 400 separate requests; two sets of Interrogatories, containing 48 separate queries; and two sets of Requests for Admission, containing 45 separate requests. As of May 2009, ASCU had produced over 150,000 pages of documents. In addition, Wolf Mountain responded to multiple rounds of written discovery, amended and supplemented its discovery responses, and subpoenaed documents from numerous third parties. The district court even appointed a special master to assist with this extensive discovery because of ongoing disputes between the parties.

¶ 6 In addition to discovery matters, the district court has heard and ruled upon numerous motions, including several motions filed by Wolf Mountain. For instance, Wolf Mountain filed a motion to dismiss, a stipulated motion for case management order, a motion to compel responses to witness discovery requests, a motion for an order increasing the bond posted by ASCU for preliminary injunction, motions relating to various scheduling issues, a motion to amend the case management order, motions to compel depositions, and motions to compel responses to subpoenas.

¶ 7 On March 12, 2009, nearly three years after this suit began, Wolf Mountain filed a Motion for Leave to add several new parties to the litigation. The district court denied Wolf Mountain's motion, citing to "the delay and lack of viable explanation for the delay and prejudice to all parties in allowing this late amendment."

¶ 8 Following the district court's denial of its Motion for Leave to add additional parties, Wolf Mountain filed a Demand for Arbitration against several parties to the SPA Agreement, including both third parties and ASCU, based on an arbitration provision contained in the SPA Agreement (Arbitration Provision). It also filed a Motion to Compel Arbitration. Until this point, three years into the litigation and after extensive discovery and numerous pretrial motions, Wolf Mountain had never asserted the right to arbitration in any of its pleadings, and had not previously made the court or ASCU

aware of its desire to seek arbitration. In fact, while fully aware of the Arbitration Provision from the outset of the litigation, Wolf Mountain admits that it had chosen to interpret the provision as not allowing it to initiate arbitration, and that it had specifically argued that it was not required to arbitrate disagreements relating to the SPA Agreement.

¶ 9 Wolf Mountain explains that it sought to pursue arbitration at this point in the proceedings in response to the district court's ruling rejecting its motion to add new parties to the suit. However, in that opinion, the district court specifically noted that its decision was not based on the Arbitration Provision: "While the court need not and does not base its decision on this argument, the court agrees with third party defendants that the SPA Agreement does require arbitration." The district court further explained its position in a later order when it stated:

> This court did not rule ... that Wolf [Mountain] MUST or COULD or SHOULD arbitrate.... This Court specifically stated it was NOT basing its decision to disallow third parties to be joined on the arbitration provision of the SPA agreement, but on Rule 14 and for other reasons.... This court did NOT rule that Wolf [Mountain] had a right to arbitrate.

The district court denied Wolf Mountain's Motion to Compel Arbitration on the grounds that Wolf Mountain had waived any potential right to arbitration by participating in litigation to a point inconsistent with an intent to arbitrate and causing prejudice to ASCU as a result. Wolf Mountain responded by filing a notice of appeal of the district court's denial of Wolf Mountain's Motion to Compel Arbitration pursuant to the Utah Uniform Arbitration Act, Utah Code Ann. § 78–31a–19 (1999).

¶ 10 This court has jurisdiction to hear the claim under Utah Code sections 78–31a–19(1) (1999) and 78A–3–102(3)(j) (Supp.2010).

## STANDARD OF REVIEW

¶ 11 "The interpretation of a statute is a question of law that we review for correctness...." *Jaques v. Midway Auto Plaza, Inc.*, 2010 UT 54, ¶ 11, 240 P.3d 769. On the other hand, determining "whether a contractual right of arbitration has been waived presents mixed questions of law and fact." *Pledger v. Gillespie*, 1999 UT 54, ¶ 16, 982 P.2d 572. However, when a district court denies a motion to compel arbitration based on documentary evidence alone, it is a legal conclusion that is reviewed for correctness. *See McCoy v. Blue Cross & Blue Shield of Utah*, 1999 UT App 199, ¶ 10, 980 P.2d 694.

## ANALYSIS

¶ 12 We first address whether the district court had jurisdiction to find that a party waived a contractual right of arbitration under section 78–31a–4, and then examine whether the district court erred in holding that Wolf Mountain had waived any potential right to arbitration.

## I.  THE DISTRICT COURT HAD JURISDICTION TO FIND THAT WOLF MOUNTAIN WAIVED A CONTRACTUAL RIGHT OF ARBITRATION UNDER SECTION 78–31a–4

¶ 13 Wolf Mountain argues that section 78–31a–4 of the Utah Arbitration Act creates a mandatory statutory right that cannot be waived, and therefore the district court did not have jurisdiction to find that Wolf Mountain had waived any potential contractual right of arbitration. Based on this argument, Wolf Mountain urges this court to overrule *Chandler v. Blue Cross Blue Shield of Utah*, 833 P.2d 356 (Utah 1992), and its progeny. We hold that section 78–31a–4 is not mandatory or jurisdictional, and that the Utah Arbitration Act does not bar courts from applying equitable contract principles to arbitration agreements. As a result, Wolf Mountain has not met its burden of persuading us to overrule our precedent. Therefore, under section 78–31a–4, courts may find that a party has waived its right to arbitration in accordance with the framework set forth in *Chandler* and its progeny.

### A. Section 78–31a–4 Is Not Mandatory or Jurisdictional

¶ 14 Wolf Mountain contends that section 78–31a–4 of the Utah Arbitration Act is mandatory and jurisdictional,[2] leaving the district court without authority to find that a party has waived the right to arbitration.[3] However, "[i]n determining whether a statutory provision is jurisdictional, we begin with the presumption that 'district courts retain their grant of constitutional jurisdiction in the absence of clearly expressed statutory intention to limit jurisdiction.'" *Sill v. Hart*, 2007 UT 45, ¶ 19, 162 P.3d 1099 (quoting *Labelle v. McKay Dee Hosp. Ctr.*, 2004 UT 15, ¶ 8, 89 P.3d 113). For a statute to deprive the district court of jurisdiction, the intention to limit the jurisdiction of the court must be clearly expressed in the statute. Neither the language of section 78–31a–4 nor the purpose of the statute clearly supports an intent to limit the jurisdiction of the court.

¶ 15 Section 78–31a–4(1) contains the following language: "The court, upon motion of any party showing the existence of an arbitration agreement, shall order the parties to arbitrate." Wolf Mountain contends that this provision is mandatory and jurisdictional, requiring the court to order arbitration when a party requests an order and can point to a contractual arbitration agreement, and affording the court no discretion to find that a party has waived the right to arbitration. However, such a reading does not account for other language contained in section 78–31a–4.

¶ 16 Specifically, section 78–31a–4(4) states that "[r]efusal to issue an order to arbitrate may not be grounded on a claim that an issue subject to arbitration lacks merit, or that fault or grounds for the claim have not been shown." It would not have been necessary to specify these two prohibited grounds for refusing arbitration if the legislature intended to prohibit the court from refusing to issue an order to arbitrate under any circumstances. Had the legislature intended section 78–31a–4 to be a mandatory and jurisdictional provision, it could have specified that courts must issue orders to arbitrate under all circumstances, or that courts may not refuse to issue orders to arbitrate under any circumstances. Instead, by providing specific guidance on the two narrow grounds upon which a refusal to issue an order to arbitrate should not be based, the text of the statute makes it clear that the legislature did not intend to limit the court's jurisdiction to refuse to issue orders to arbitrate on other grounds, such as when a party has waived its right to arbitrate.

¶ 17 In addition to the text of the statute itself, the purpose of the Act weighs against interpreting section 78–31a–4 as mandatory and jurisdictional. When determining whether a statutory provision is mandatory and jurisdictional, "[t]he most fundamental [guideline] is that the court should give effect to the intention of the legislature." *Sjostrom v. Bishop*, 15 Utah 2d 373, 393 P.2d

---

2. Although Wolf Mountain argues that a mandatory designation renders a statute jurisdictional, even if section 78–31a–4 were mandatory, it is not necessarily jurisdictional. As the court of appeals explained in *Pearson v. Lamb*, "Utah courts have held that certain procedures required by statute are inconsequential to a court's jurisdiction." 2005 UT App 383, ¶ 11, 121 P.3d 717.

3. Wolf Mountain contends that mandatory statutes cannot be waived, even by parties themselves. Even if section 78–31a–4 were mandatory, this court has nonetheless previously held that "[w]aiver or estoppel may be found in the face of a mandatory statute." *Rice v. Granite Sch. Dist.*, 23 Utah 2d 22, 456 P.2d 159, 162 (1969) (quoting *Hurley v. Town of Bingham*, 63 Utah 589, 228 P. 213, 214 (1924)). For example, " 'statutes of limitation ordinarily are mandatory

both in form and effect. Nevertheless, they may be waived or the party may be estopped from relying upon them.' " *Id.* (quoting *Hurley*, 228 P. at 214.). In such circumstances, it may be equitable to allow waiver or estoppel in the face of a mandatory statute because " '[o]ne cannot justly or equitably lull an adversary into a false sense of security thereby subjecting his claim to the bar of limitations, and then be heard to plead that very delay as a defense to the action when brought.' " *Id.* at 163 (quoting *North v. Culmer*, 193 So.2d 701, 705 (Fla.Ct.App.1967)). This reasoning is applicable here; even if section 78–31a–4 were mandatory, it would still be equitable to find waiver of the right to arbitrate when a party has relinquished its right to arbitration through substantial participation in litigation that caused prejudice to the opposing party.

472, 474 (1964).[4] Determining the intention of the legislature "requires us to consider what the figurative 'legislative mind' would have intended had it adverted to the particular circumstances we are confronted with for adjudication." *Id.* In doing this, we take into account the purpose of the statute and "what interpretation and application will best serve that purpose in practical operation." *Id.*

¶ 18 In this case, construing the statute as preventing courts from refusing to issue orders to arbitrate because of waiver would run contrary to the purpose of the Utah Arbitration Act. The legislature enacted the Act in accordance with a public policy that favors arbitration agreements as contractual agreements between parties not to litigate, *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 16, 40 P.3d 599, only insofar as they serve as "speedy and inexpensive methods of adjudicating disputes," *Allred v. Educators Mut. Ins. Ass'n of Utah*, 909 P.2d 1263, 1265 (Utah 1996), and help reduce strain on judicial resources, See *Chandler*, 833 P.2d at 358. There is no public policy supporting arbitration when it would undermine these goals. "The policies favoring arbitration are largely defeated when the right of arbitration is not raised until an opposing party has undertaken much of the expense necessary to prepare a case for trial." *Id.* at 361. As ASCU argues in its brief, if courts were unable to refuse to issue orders to arbitrate when a party has waived its right to arbitration,

> there would be nothing to stop a party from litigating a case all the way to the close of evidence at trial and, if it then senses an unfavorable outcome, filing a motion to compel arbitration before the jury returns the verdict, which the court would 'have' to grant so long as an arbitration agreement existed.

Such an outcome would clearly undermine the purpose of the Act.

¶ 19 In addition, provisions are generally not considered mandatory, "which are not of the essence of the thing to be done, but which are given with a view merely to the proper, orderly and prompt conduct of ... business, and by the failure to obey no prejudice will occur to those whose rights are protected by the statute." *Kennecott Copper Corp. v. Salt Lake Cnty.*, 575 P.2d 705, 706 (Utah 1978) (internal quotation marks omitted). We have stated in the past that the Utah Arbitration Act is a procedural, rather than a substantive, statute because it does not " 'enlarge, eliminate, or destroy vested or contractual rights.' " *Powell v. Cannon*, 2008 UT 19, ¶ 3 n. 1, 179 P.3d 799 (quoting *Dep't of Soc. Servs. v. Higgs*, 656 P.2d 998, 1000 (Utah 1982)). A procedural statute "provides a remedy for already existing rights or merely adds to or provides a substitute for already existing remedies." *Docutel Olivetti Corp. v. Dick Brady Sys., Inc.*, 731 P.2d 475, 478 (Utah 1986). Because the Utah Arbitration Act is meant to provide guidance on the process of enforcing a contractual right, rather than to provide any new statutory right, it was therefore "given with a view merely to the proper, orderly and prompt conduct of ... business." *Kennecott Copper*, 575 P.2d at 706 (internal quotation marks omitted).

¶ 20 Furthermore, allowing courts to refuse to issue orders to arbitrate when parties have waived their contractual right to arbitration does not cause prejudice to "occur to those whose rights are protected by the statute." *Id.* (internal quotation marks omitted). If a party manifests its intent to waive its right to arbitrate, its rights are not prejudiced if the court refuses to issue an order to arbitrate. *See Chandler*, 833 P.2d at 360 (stating that "there is an affirmative duty to enforce contractual rights"). On the other hand, if the court could not refuse to issue orders to arbitrate when one party waives its contractual right of arbitration, the other party's rights would be prejudiced. *See id.* ("[I]t is not the policy of this court to allow a party to suffer prejudice because an opposing party has failed to timely assert a contractual right.").

---

4. *See also Kennecott Copper Corp. v. Salt Lake Cnty.*, 575 P.2d 705, 706 (Utah 1978) ("There is no universal rule by which directory provisions may, under all circumstances, be distinguished from those which are mandatory. The intention of the legislature, however, should be controlling and no formalistic rule of grammar or word form should stand in the way of carrying out the legislative intent." (internal quotation marks omitted)).

¶ 21 In considering the text of the statute, as well as the purpose of the Utah Arbitration Act, we hold that section 78–31a4 is not mandatory and jurisdictional, leaving the district court with authority to consider whether a party has waived its right to arbitrate.[5]

### B. The Utah Arbitration Act Does Not Abrogate Equitable Contract Principles

¶ 22 The right to arbitration is a contractual right. *See Chandler*, 833 P.2d at 360; *Cent. Fla. Invs.*, 2002 UT 3, ¶ 22, 40 P.3d 599. In prior cases, we have held that equitable contract principles are not abrogated by the Utah Arbitration Act. In *Chandler*, we held that a party could waive a contractual right of arbitration through substantial participation in litigation that caused prejudice to the other party. 833 P.2d at 360. This is consistent with other cases that have applied equitable contract principles to arbitration agreements. For instance, in *Jenkins v. Percival*, we held that the equitable contract principle of part performance could be employed to enforce an oral arbitration agreement, even though the Utah Arbitration Act required an arbitration agreement to be in writing to be enforceable. 962 P.2d 796, 801 (Utah 1998). Similarly, in *Sosa v. Paulos*, we held that the equitable doctrine of unconscionability could be used to bar enforcement of an agreement to arbitrate. 924 P.2d 357, 361–65 (Utah 1996). Thus, under section 78–31a–4, the district court may apply equitable contract principles to determine that a party has waived its right to arbitrate.

### C. Wolf Mountain Does Not Meet Its Burden Regarding the Overruling of Precedent

¶ 23 Wolf Mountain argues that we should overrule *Chandler* and its progeny. However, long standing precedent "should not be overruled except for the most compelling reasons." *Wilson v. Manning*, 657 P.2d 251, 254 (Utah 1982). Any party asking a court "to overturn prior precedent ha[s] a substantial burden of persuasion. This burden is mandated by the doctrine of stare decisis." *State v. Menzies*, 889 P.2d 393, 398 (Utah 1994) (citation omitted). A court " 'will follow the rule of law which it has established in earlier cases, unless clearly convinced that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent.' " *Id.* at 399 (quoting John Hanna, *The Role of Precedent in Judicial Decision*, 2 Vill. L.Rev. 367, 367 (1957)).

¶ 24 Wolf Mountain does not allege that *Chandler* is no longer sound because of changing conditions, as *Chandler* was decided in 1992, which was after the Utah Arbitration Act was originally adopted in 1985. Wolf Mountain appears to allege simply that the rule was originally wrong and should be abandoned. We are unpersuaded and continue to view *Chandler*'s holding as correct and consistent with our conclusions that section 78–31a–4 is not mandatory and jurisdictional, and therefore can be waived in accordance with equitable contract principles. Wolf Mountain has not met its burden of persuasion.

### II. THE DISTRICT COURT WAS CORRECT IN HOLDING THAT WOLF MOUNTAIN WAIVED ANY POTENTIAL CONTRACTUAL RIGHT OF ARBITRATION

### A. Wolf Mountain Was Not Required to Marshal the Evidence

¶ 25 ASCU contends that Wolf Mountain "must marshal all the evidence in support of the trial court's findings and then

---

5. Other courts have followed similar reasoning when faced with the argument that an arbitration statute divests the court of jurisdiction to find that a party has waived its right to arbitrate. For instance, in *Lamell Lumber Corp. v. Newstress International Inc.*, the defendant argued that Vermont courts were divested of jurisdiction to find waiver of an agreement to arbitrate because the Vermont Arbitration Act stated that the court shall order the parties to proceed with arbitration. 182 Vt. 282, 938 A.2d 1215, 1218–21 (2007). The Vermont Supreme Court rejected this argument, stating that "[a]n arbitration agreement ... remains a creature of *contract* reflecting a voluntary agreement between the parties and as such may be waived by the parties." *Id.* at 1220.

demonstrate that even viewing it in the light most favorable to the court below, the evidence is insufficient to support the findings." *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985). ASCU claims that because Wolf Mountain has not attempted to marshal the evidence in support of the district court's decision, we should assume that the district court's decision is adequately supported by the evidence. However, this argument misunderstands Wolf Mountain's position. Because Wolf Mountain is challenging the legal conclusions of the district court based on the undisputed factual record, rather than the sufficiency of the evidence, Wolf Mountain is not required to marshal the evidence. *Peirce v. Peirce*, 2000 UT 7, ¶ 17 n. 4, 994 P.2d 193 ("[T]he marshaling requirement applies only to challenges of factual findings, not to conclusions of law."); *Birch Creek Irrigation v. Prothero*, 858 P.2d 990, 993 n. 3 (Utah 1993) ("[Since defendants] are not attacking the sufficiency of the evidence . . . [but rather] arguing that the trial court did not comply with the requirements of the applicable rules as a matter of law . . . . [they are] not required to marshal the evidence. . . .").

### B. Wolf Mountain Is Charged with a Knowledge of the Terms of the SPA Agreement

¶ 26 " 'A waiver is the intentional relinquishment of a known right. To constitute a waiver, there must be an existing right, benefit or advantage, a knowledge of its existence, and an intention to relinquish it.' " *Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 938 (Utah 1993) (quoting *Phoenix Ins. Co. v. Heath*, 90 Utah 187, 61 P.2d 308, 311–12 (1936)). Wolf Mountain argues that it could not relinquish a "known" right because it originally believed that it did not have the right to pursue arbitration. In other words, Wolf Mountain argues that it could not waive the right to arbitration because it did not know it had the right until the district court's April 29, 2009 order denying Wolf Mountain's request to add new parties to the case.

¶ 27 Wolf Mountain was clearly aware of the arbitration provision in the SPA Agreement from the outset of this litigation; it simply chose to interpret the provision as not providing it with the right to arbitrate. Wolf Mountain acknowledges that, from the beginning of this proceeding, it has "asserted that the SPA Agreement's arbitration provision does not apply to the current litigation." As the district court stated in its August 11, 2009 ruling:

> Whatever the SPA Agreement says, Wolf was aware of it fully long before April 29, 2009. If Wolf did not believe it could arbitrate under that agreement, it evidently acted on that basis. If Wolf believed that it could arbitrate under that agreement, it should have moved to compel arbitration long ago.

¶ 28 Furthermore, sophisticated business parties are charged with knowledge of the terms of the contracts that they enter into. Thus, when a party like Wolf Mountain enters into a contract, it "is not permitted to show that [it] did not know its terms, and in the absence of fraud or mistake [it] will be bound by all its provisions, even though [it] has not read the agreement and does not know its contents." *Semenov v. Hill*, 1999 UT 58, ¶ 12, 982 P.2d 578 (emphasis omitted) (quoting 17 *C.J.S. Contracts* § 41(f) (1963)). Under Utah law, "each party has the burden to read and understand the terms of a contract before he or she affixes his or her signature to it. A party may not sign a contract and thereafter assert ignorance or failure to read the contract as a defense." *John Call Eng'g, Inc. v. Manti City Corp.*, 743 P.2d 1205, 1208 (Utah 1987). Wolf Mountain had the responsibility to understand all the provisions of the contract when it signed the SPA Agreement. As a sophisticated business party, Wolf Mountain is charged with a knowledge of any potential right of arbitration when determining whether Wolf Mountain waived the right to arbitration.

### C. The District Court Properly Applied Chandler's Two–Part Test in Finding that Wolf Mountain Waived Any Potential Contractual Right of Arbitration

¶ 29 " 'Waiver of a contractual right occurs when a party to a contract intentionally acts in a manner inconsistent with its

contractual rights, and, as a result, prejudice accrues to the opposing party or parties to the contract.' " *Flake v. Flake (In re Estate of Flake)*, 2003 UT 17, ¶ 31, 71 P.3d 589 (quoting *Interwest Constr. v. Palmer*, 886 P.2d 92, 98 (Utah Ct.App.1994)). In the context of arbitration, this amounts to a two-part test to determine if a party has waived its contractual right: (1) whether the party seeking to assert the right has "participat[ed] in litigation to a point inconsistent with the intent to arbitrate," and (2) whether the opposing party has been prejudiced as a result. *Chandler v. Blue Cross Blue Shield of Utah*, 833 P.2d 356, 360 (Utah 1992).

### 1. Wolf Mountain Substantially Participated in Litigation

¶ 30 This prong of the *Chandler* test requires the court to consider "the actions of the party seeking arbitration, and whether those actions evidence an intent to submit to the jurisdiction of the court and pursue redress through litigation." *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 26, 40 P.3d 599. Wolf Mountain clearly had the intent to pursue matters through litigation rather than to seek arbitration. Indeed, in its brief, Wolf Mountain conceded that "Wolf Mountain's 'intent' need not be inferred, since it expressly stated its intent on the record." According to its brief, Wolf Mountain intended to pursue litigation because it believed that it did not have the right to pursue arbitration under the SPA Agreement. Wolf Mountain further acknowledges that it developed an intent to pursue arbitration only as a result of the district court's ruling on April 29, 2009, which was three years after the litigation had commenced. Thus, Wolf Mountain's own admissions show that it had a clear intent to pursue litigation rather than arbitration.

¶ 31 In addition to its explicitly stated intent to pursue litigation, Wolf Mountain's actions also clearly manifest an intent to pursue litigation rather than arbitration. A variety of conduct can show a party's intent to pursue litigation. In *Central Florida Investments*, the court explained:

> Participation in discovery and other aspects of litigation that do not necessarily

involve the court are factors we consider in trying to ascertain a party's intent or attitude toward its participation in litigation. Requests made of the court by the parties, however, have even greater weight. We consider especially important whether the parties' requests of the court demonstrate an intent to pursue litigation or whether they demonstrate an intent to avoid litigation and a desire to be sent to arbitrate. Accordingly, parties seeking to enforce arbitration should ensure that the *court*, not just the opposing party, is informed that arbitration is desired. In doing so, judicial resources will be appropriately conserved. *Id.*

¶ 32 For instance, in *Chandler*, the court found that Blue Cross "clearly manifest[ed] an intent to proceed to trial" by filing an answer and a cross-claim, participating in discovery for five months, and reviewing discovery that had already taken place. 833 P.2d at 360. Similarly, in *Smile Inc. Asia Pte. Ltd. v. BriteSmile Management, Inc.*, the court of appeals found that BriteSmile had participated in litigation to an extent inconsistent with a desire to arbitrate by filing various motions and memoranda, a counterclaim, scheduling orders, various motions involving discovery, serving various requests for discovery, responding to discovery requests, and communicating with the court and opposing counsel about issues related to litigation. 2005 UT App 381, ¶ 26, 122 P.3d 654.

¶ 33 On the other hand, the court will not find that a party has waived its right to arbitrate when it participates in litigation "reluctantly, demonstrating a sufficient intent to arbitrate" along the way. *Cent. Fla. Invs.*, 2002 UT 3, ¶ 34, 40 P.3d 599. In *Central Florida Investments*, three days after the plaintiff filed its complaint, the defendant sent plaintiff a letter explaining that the dispute was subject to arbitration. *Id.* ¶ 3. The defendant filed an answer to comply with the Utah Rules of Civil Procedure, but at the same time, it filed a counterclaim and a motion to dismiss both raising the issue of arbitration. *Id.* ¶¶ 5–6. When the district court denied, in part, the defendant's motion to dismiss, the defendant filed a motion to

compel arbitration four days later, which was also denied. *Id.* ¶¶ 8–9. On appeal, we ruled that the defendant had not waived its right to arbitrate because it "did not participate in litigation to a point inconsistent with the intent to arbitrate." *Id.* ¶ 36. Instead, from the beginning and throughout the proceedings, the defendant expressed a desire to arbitrate and indicated that it was unwilling to participate in litigation. *Id.* ¶ 34.

¶ 34 Unlike the defendant in *Central Florida Investments*, Wolf Mountain did not express a desire to arbitrate at the commencement or during the proceedings in this case. Instead, it actively participated in litigation for nearly three years before requesting arbitration for the first time in May 2009. Like the parties in *Chandler* and *Smile Inc. Asia*, Wolf Mountain's actions manifested an intent to proceed to trial. Wolf Mountain filed a motion to dismiss, an answer and a counterclaim, and participated in discovery and filed many motions over the course of three years. Wolf Mountain even filed a separate lawsuit that was later consolidated with this litigation. In light of these actions, Wolf Mountain's extensive participation in litigation clearly shows that it "intended to disregard its right to arbitrate." *Id.* ¶ 24.

2. Wolf Mountain's Participation in Litigation Has Prejudiced ASCU.

¶ 35 If the party seeking arbitration has participated in litigation to a point inconsistent with arbitration, "the determination of whether waiver has occurred rests solely on a finding of prejudice .... result[ing] from the delay in the assertion of the right to arbitrate." *Chandler*, 833 P.2d at 359. "[A]ny real detriment is sufficient to support a finding of prejudice." *Id.* at 360. Prejudice includes the other party incurring "the types of expenses that arbitration is designed to alleviate" or expenses that the other party would not have incurred if the moving party had restricted its efforts to arbitration. *Id.* at 359. Prejudice can also arise "if a party gains an advantage in arbitration through participation in pretrial procedures," such as obtaining discovery or other advantages that would not have been available in arbitration. *Id.* In addition, prej-

udice can occur "when the party seeking arbitration is attempting to forum-shop after 'the judicial waters [have] ... been tested.'" *Id.* (alterations in original) (quoting *Wood v. Millers Nat'l. Ins. Co.*, 96 N.M. 525, 632 P.2d 1163, 1165 (1981)).

¶ 36 In this case, ASCU has been prejudiced by Wolf Mountain's participation in litigation. In responding to Wolf Mountain's numerous requests for discovery and other pretrial procedures, ASCU has undergone "the types of expenses that arbitration is designed to alleviate." *Id.* Furthermore, Wolf Mountain's extensive discovery has allowed it to obtain information that would not have been available in arbitration. This would give Wolf Mountain "an advantage in arbitration through [its] participation in pretrial procedures." *Id.* In addition, Wolf Mountain's attempt to compel arbitration at this late point in the proceedings is indicative of a desire to "forum-shop after 'the judicial waters [have] ... been tested.'" *Id.* (alterations in original) (quoting *Wood*, 632 P.2d at 1165). The prejudice that ASCU would suffer in arbitration as a result of Wolf Mountain's extensive participation in litigation is sufficient to support the conclusion that Wolf Mountain has waived any potential right to arbitration.

D. *Wolf Mountain Waived Any Contractual Right of Arbitration Despite the No Waiver Provision of the SPA Agreement*

¶ 37 In its reply brief, Wolf Mountain argues, apparently for the first time, that under section 6.14 of the SPA Agreement (No Waiver Provision), ASCU agreed that "failure of a party hereto to exercise any right hereunder shall not be deemed a waiver of any such right and shall not affect the right of such party to exercise at some future time said right or any other right it may have hereunder." While a no-waiver provision is one element to be considered in analyzing whether waiver has occurred, it is not determinative. In *Living Scriptures, Inc. v. Kudlik*, the court noted that rather than viewing a no-waiver provision in an agreement as a complete bar to a finding of waiver, "the best approach is to view the existence of an antiwaiver provision

as merely one factor to consider in determining whether a party has waived its rights under the agreement."[6] 890 P.2d 7, 10 n. 5 (Utah Ct.App.1995). Under this approach, when dealing with arbitration agreements that incorporate or explicitly contain no-waiver provisions, other courts have found that such no-waiver provisions do not prevent a court from finding that a party has waived its right to arbitration.[7]

¶ 38 Moreover, " 'parties to written contracts may modify, waive or make new terms regardless of provisions in the contracts to the contrary.' " *Dillman v. Massey Ferguson, Inc.*, 13 Utah 2d 142, 369 P.2d 296, 298 (1962) (quoting *Davis v. Payne & Day, Inc.*, 10 Utah 2d 53, 348 P.2d 337, 340 (1960)); *see also Lone Mountain Prod. Co. v. Natural Gas Pipeline Co. of Am.*, 984 F.2d 1551, 1557 (10th Cir.1992) ("[U]nder Utah law, parties

may modify or waive the terms of a contract, despite contractual provisions to the contrary." (citing *Dillman*, 369 P.2d at 298)). Thus, under some circumstances, a no-waiver provision can itself be waived.[8]

¶ 39 In this case, Wolf Mountain did not mention the No Waiver Provision to the district court in its Memorandum in Support of Motion to Compel Arbitration or in its Reply Memorandum, and did not refer to the provision on appeal in its opening brief. Wolf Mountain did not reference the provision until its reply brief. In light of Wolf Mountain's failure to act on the No Waiver Provision prior to this point, combined with Wolf Mountain's substantial participation in litigation and the prejudice caused to ASCU, we hold that Wolf Mountain waived any potential contractual right to arbitrate in spite of the No Waiver Provision of the SPA Agreement.[9]

6. Other courts have also held that a no-waiver provision is just one factor to consider in determining the question of waiver. See, e.g., *Riverside Dev. Co. v. Ritchie*, 103 Idaho 515, 650 P.2d 657, 663–64 (1982); *M.J.G. Props., Inc. v. Hurley*, 27 Mass. App. 250, 537 N.E.2d 165, 166–67 (1989).

7. *See, e.g., Republic Ins. Co. v. PAICO Receivables LLC*, 383 F.3d 341, 348–49 (5th Cir.2004) (finding that a contractual no-waiver provision does not prevent a court from ruling that a party has waived its right to arbitration); *S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 86 (2d Cir.1998) (determining "that the presence of [a] 'no waiver' clause does not alter the ordinary analysis undertaken to determine if a party has waived its right to arbitration"); *Seidman & Seidman v. Wolfson*, 50 Cal.App.3d 826, 123 Cal. Rptr. 873, 878 (1975) (stating that a no-waiver provision should not permit a party to seek judicial relief "and later to switch course and demand arbitration"); *Home Gas Corp. of Mass. v. Walter's of Hadley, Inc.*, 403 Mass. 772, 532 N.E.2d 681, 684–85 (1989) (holding that a no-waiver provision did not prevent the court from finding waiver by conduct through involvement in litigation).

8. "The general view is that a party to a written contract can waive a provision of that contract by conduct expressly or surrounding performance, despite the existence of a so-called anti-waiver or 'failure to enforce' clause in the contract." 13 *Williston on Contracts* § 39:36 (4th ed.2000). This is "based on the view that the nonwaiver clause itself, like any other term of the contract, is subject to waiver by agreement or conduct during performance." *Id.; see also Porterco, Inc. v. Igloo Prods. Corp.*, 955 F.2d 1164, 1172 n. 9 (8th Cir.1992) ("[I]t is within the jury's

power to find that such a provision was itself waived or modified by the parties' agreement or conduct."); *Transpower Constructors v. Grand River Dam Auth.*, 905 F.2d 1413, 1419 (10th Cir.1990) (noting that it would be unfair for the court to enforce a no-waiver provision after the party had essentially waived the benefits of the provision's protection); *Westinghouse Credit Corp. v. Shelton*, 645 F.2d 869, 873–74 (10th Cir.1981) ("[T]he weight of authority, and the view we think Oklahoma state courts would follow, is that an 'anti-waiver' clause, like any other term in the contract, is itself subject to waiver or modification by course of performance...."); *Hosp. Prods., Inc. v. Sterile Design, Inc.*, 734 F.Supp. 896, 904 (E.D.Mo.1990) ("[D]efendant may waive a term of a contract through its actions notwithstanding a 'failure to enforce' provision in the contract."); *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F.Supp. 1087, 1098 (S.D.N.Y.1989) ("New York law allows the parties to waive ... a no-waiver provision by a subsequent course of conduct."); *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 666 N.W.2d 251, 257 (2003) ("[C]ontracts with written modification or anti-waiver clauses can be modified or waived notwithstanding their restrictive amendment clauses."); *Lee v. Wright*, 108 A.D.2d 678, 485 N.Y.S.2d 543, 544 (1985) ("[I]t has long been the rule that parties may waive a 'no-waiver' clause.").

9. Furthermore, even if the No Waiver Provision otherwise supported a finding that Wolf Mountain had not waived any right to arbitration, "[a]s a general rule, claims not raised before the trial court may not be raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346. There are only narrow exceptions to this preservation

## CONCLUSION

¶ 40 Utah public policy favors arbitration agreements only insofar as they provide a speedy and inexpensive means of adjudicating disputes, and reduce strain on judicial resources. In this case, enforcing the arbitration agreement would undercut both policy rationales: arbitration at this point would be neither a speedy and inexpensive way to adjudicate this dispute, nor a means of reducing strain on judicial resources. Public policy is better served by finding waiver where a party has participated in litigation to a point inconsistent with an intent to arbitrate, when such participation causes prejudice to the other party. We hold that the district court had jurisdiction to consider whether Wolf Mountain had waived its contractual right of arbitration under Utah Code section 78–31a–4, and that the district court was correct in holding that Wolf Mountain waived any such right.

¶ 41 Associate Chief Justice DURRANT, Justice PARRISH, Justice NEHRING, and Judge WEST concur in Chief Justice DURHAM'S opinion.

¶ 42 District Judge W. BRENT WEST sat.

rule, such as when "a defendant can demonstrate that 'exceptional circumstances' exist or 'plain error' occurred." *Id.* Wolf Mountain demonstrates neither exceptional circumstances nor plain error.