2013 UT App 185

# THE UTAH COURT OF APPEALS

MCCLEVE PROPERTIES, LLC,
Plaintiff, Appellee, and Cross-appellant,

*v.*

D. RAY HULT FAMILY LTD. PARTNERSHIP AND D. RAY HULT,
Defendants, Appellants, and Cross-appellees.

Memorandum Decision
No. 20110594-CA
Filed July 26, 2013

Third District, Salt Lake Department
The Honorable Stephen L. Henriod
The Honorable Robert K. Hilder[1]
No. 070905164

Jon C. Heaton and M. David Eckersley, Attorneys
for Appellants
Bruce J. Nelson and Jeffrey S. Williams, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Memorandum Decision,
in which JUDGES WILLIAM A. THORNE JR. and
MICHELE M. CHRISTIANSEN concurred.

ROTH, Judge:

¶1 D. Ray Hult Family Ltd. Partnership and D. Ray Hult (collectively, Hult) appeal from the district court's entry of partial

---

[1]All of the decisions from which the parties appeal were made by Judge Stephen L. Henriod, but because "[n]o final Court Order of disposition ha[d] been issued," there was no final order for purposes of seeking appellate review. The parties therefore stipulated to a final order, which was entered by Judge Robert K. Hilder.

summary judgment in favor of McCleve Properties, LLC (McCleve) and its subsequent award of income tax-related damages to McCleve. McCleve cross-appeals, asserting that the district court erroneously denied its request for additional damages for loss of use and delayed amortization. We affirm the grant of summary judgment and the district court's denial of loss of use and amortization damages. We reverse the award of tax-related damages and remand for further proceedings consistent with this decision.

¶2 The background facts are undisputed. In 2004, Marshall Industries, Inc. (Marshall) rented commercial space (the Premises) from Hult pursuant to a lease agreement (the Lease) with a term of nine years. According to the Lease, Marshall could not "assign this Lease or sublet the Premises or any part thereof with out the prior written consent of [Hult]." The Lease also contained a provision (the purchase option) affording Marshall or its assigns "an 'Option to Purchase' the Premises, which option may be exercised during a window of time from March 1, 2005, through the end of February 2007." To exercise that option, Marshall, or its assignee, was required to give Hult "written notice of intent to purchase the Premises and then complete the purchase transaction within 120 days thereafter, unless [Hult] requests that the closing date . . . be extended for up to sixty (60) days." The Lease also contemplated that Marshall would "reasonably cooperate with [Hult] on [a] Section 1031 tax deferred exchange."

¶3 On October 30, 2006, Marshall notified Hult, by a notarized letter printed on Marshall letterhead, that it had "assign[ed the] 'Option to Purchase' outlined in [the Lease] to McCleve." The Marshall letter was signed by Dennis J. Savage, as President of Marshall, and by Randall D. McCleve, as General Partner of McCleve. The letter did not seek written permission for the assignment but simply noted that Marshall had assigned the

purchase option. The next day, Mr. McCleve, again in his capacity as McCleve's General Partner, sent Hult, on McCleve letterhead and with notarized signature, a "written notice that the purchase option is being exercised as per the [L]ease." In the letter, McCleve explained that it intended to employ a section 1031 exchange in the purchase of the Hult property in order to attain a tax deferral on the proceeds of other rental property it had sold. McCleve advised that to accomplish its purpose, "[t]his exchange must take place no later than March 31, 2007," but the closing could occur sooner if Hult so desired. The letter further stated that McCleve was exercising the purchase option pursuant to the assignment from Marshall and that a copy of the "[w]ritten notice of this assignment is included." A copy of the assignment was attached to the letter.

¶4    Hult responded on November 20, 2006, with a letter addressed to Randall D. McCleve at Marshall's address. Hult confirmed receipt of the McCleve letter "notifying . . . that you are going to exercise your Purchase Option as per" the Lease and explained that Hult "anticipate[d] waiting for a March 2007 closing," although it would evaluate whether an earlier date was possible. Hult expressed no concern with Marshall's assignment of the purchase option to McCleve without Hult's written consent, nor did Hult acknowledge that the anticipated closing in March 2007 would occur beyond the 120-day period specified by the option for completing the purchase once the option was exercised. In March 2007, McCleve contacted Hult to make arrangements for the closing. In response, Hult's attorney informed McCleve, for the first time, that Hult would not participate in any closing, apparently because the closing date was outside the purchase option's120-day closing period, which had ended on February 28, 2007.

¶5    McCleve then filed this suit, seeking specific performance and damages resulting from breach of contract. The parties filed

cross-motions for summary judgment, with Hult asserting that McCleve had failed to strictly comply with the terms of the Lease either in obtaining the assignment or in exercising the purchase option and McCleve claiming both that it had timely exercised the purchase option and that Hult had waived any claim that the assignment was void. McCleve attached to its motion copies of the Lease and the three letters. In support of its opposition to McCleve's motion for summary judgment and its own cross-motion, Hult attached the affidavit of D. Ray Hult, in which Mr. Hult stated, in pertinent part,

> 2. At no time was I asked to, nor in fact did I, consent to any assignment of any of the rights or obligations contained in the Lease between [Hult] and [Marshall].
>
> . . . .
>
> 4. On November 20, 2006, I prepared a letter addressed to Marshall Industries, Inc. acknowledging receipt of the written Notice.
>
> 5. At the time I wrote the letter of November 20, 2006, I did not review the underlying Option contained in the Lease and was not aware that it required the completion of the purchase within one hundred twenty (120) days from receiving written notice.
>
> 6. At no time did I intend to waive any of the requirements of the Option to Purchase and fully intended that it be exercised in conformity with its terms.

¶6     Following argument, the district court granted McCleve's motion, concluding that Hult had waived strict compliance with the terms of the Lease. Specifically, in response to Hult's claim that the Lease required Hult's permission to assign the option provision, the court said, "No one sought [Hult's] permission . . . [but t]he undisputed material facts before the Court, demonstrate an inference of relinquishment, because [Hult]'s letter made no attempt to assert the Lease's requirement that [Hult's] permission must be first obtained." The court further explained that Hult's use of "your" in describing McCleve's intent to "exercise your Purchase Option" "show[ed] that [Hult] accepted the assignment, and offered little resistance to the fact that [McCleve] was 'going to exercise' that option" instead of Marshall, especially when viewed in light of the fact that Hult "expressed an anticipated closing date that met the requirements of [McCleve]'s prior letter." Regarding Hult's claim that the purchase option was exercised outside the window contemplated by the Lease, the court stated,

> [Hult] signed the Lease agreement and agreed to its terms. [Hult] agreed to [McCleve's] request for a March 2007 closing and again made utterly no attempt to enforce the provisions of the Lease . . . . This letter manifested [Hult]'s acquiescence to [McCleve's] assertion of its right to exercise the purchase option in March 2007. The totality of the circumstances, make patent, that as a matter of law, [Hult] extended the deadline and waived [its] right to now claim [McCleve] did not follow the Lease's [purchase option] deadlines.

¶7     While the court granted summary judgment to McCleve on the issue of Hult's waiver of the Lease requirements, the court declined to make a contemporaneous award of specific performance or damages "because issues of material fact remain as

to what the appropriate remedies are[] and whether the remedy should be damages or specific performance." McCleve subsequently moved for an order of specific performance, which the court granted, and other damages, on which the court reserved its ruling. When Hult then refused to complete the sale, McCleve moved for an order to compel. The court ordered Hult to close the sale of the Premises, found Hult in contempt, and awarded McCleve its attorney fees, costs, and expenses resulting from Hult's delay in completing the purchase transaction. After the transaction was completed, McCleve filed a motion seeking additional damages from Hult's breach of the Lease and its earlier contempt in failing to close. McCleve estimated its total damages, including "(1) interest on tenant security deposits, (2) closing costs, (3) cash flow payments, (4) amortization benefits, (5) income taxes paid, and (6) attorneys' fees," at $144,000. The court "granted [McCleve]'s damages for (1) interest on security deposits, (2) closing costs, (3) income taxes paid, and (4) attorney's fees," which amounted to an award of $83,354.

¶8 Hult now appeals the district court's decision to grant summary judgment to McCleve on the issue of waiver and to deny Hult's own motion for summary judgment on this issue. Both parties appeal the damages award. Hult contends that the court erred in awarding McCleve $52,096 in compensation for additional income taxes McCleve paid as a result of its contemplated section 1031 exchange having been thwarted by Hult's failure to close, asserting that such damages "could not have been contemplated by the parties to the contract" because McCleve itself was not a party to the original Lease agreement. For its part, McCleve argues that the court erred in not awarding additional damages, specifically McCleve's loss of use of the Premises and the loss of principal amortization on the loan it took out to pay for the Premises between the time McCleve should have acquired the Premises in March 2007 and the time that McCleve actually acquired it in July 2008.

I. Summary Judgment

¶9      "Summary judgment is proper only where 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Peterson v. Coca-Cola USA*, 2002 UT 42, ¶ 7, 48 P.3d 941 (quoting Utah R. Civ. P. 56(c)). "However, unlike most cases, the legal conclusions underlying a trial court's grant of summary judgment on a waiver issue are reviewed with some measure of deference." *IHC Health Servs., Inc. v. D & K Mgmt., Inc.*, 2003 UT 5, ¶ 6, 73 P.3d 320. "Waiver is an intensely fact dependent question." *Id.* ¶ 7. This means that

> [i]n a waiver case decided on a motion for summary judgment, we must first inquire whether there are disputed material facts. If there are no disputed material facts, we consider all undisputed material facts in the light most favorable to the nonmoving party before determining whether the trial court's decision on the application of the law of waiver to those facts falls within the bounds of its discretion.

*Id.* ¶ 6 (citation omitted).

¶10     "'A waiver is the intentional relinquishment of a known right. To constitute waiver, there must be [(1)] an existing right, benefit or advantage, [(2)] a knowledge of its existence, and [(3)] an intention to relinquish it.'" *Geisdorf v. Doughty*, 972 P.2d 67, 72 (Utah 1998) (quoting *Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 940 (Utah 1993)). A waiver may be express or implied, but it must be distinctly made under the totality of the circumstances. *Id.* In the contract context, a waiver "occurs when a party to a contract intentionally acts in a manner inconsistent with its contractual rights, and, as a result, prejudice accrues to the opposing party or parties to the contract." *Mid–America Pipeline Co. v. Four–Four, Inc.*, 2009 UT 43, ¶ 17, 216 P.3d 352 (citation and

internal quotation marks omitted). The Utah Supreme Court, however, has cautioned "trial courts to be especially careful in their examination of the evidence in questions of waiver and option performances, especially where . . . waiver is merely implied." *Geisdorf*, 972 P.2d at 72. Nevertheless, even though the optionee ordinarily must act "precisely according to the terms of the option" when it seeks to exercise a purchase option, *id.* at 70 (citation and internal quotation marks omitted), strict compliance may be excused by the optionor's waiver so long as that waiver is distinctly made in a manner that is "unambiguous," *id.* at 72.

¶11     Hult claims that the district court erred in determining that it had unambiguously waived its right to enforce the Lease's assignment and purchase option provisions by means of the Hult letter. Hult's claim rests on two interdependent arguments. First, it asserts that Mr. Hult's affidavit statement "denying the intent to waive" the requirements for an assignment under the Lease, regardless of anything to the contrary in the Hult letter, raises an issue of fact sufficient to survive summary judgment. Second, Hult asserts that it could not have waived its right to enforce the time restrictions governing exercise of the purchase option when, because Mr. Hult had not read the Lease for some time, he was not even aware of the relevant Lease provisions at the time he wrote the letter.[2] Thus, we are presented with a question of whether

---

[2]At oral argument before this court, Hult focused on a third basis for reversing the grant of summary judgment to McCleve: Hult was confused about who was exercising the purchase option because it thought Mr. McCleve was acting on behalf of Marshall, for which he was an agent. Hult asserted that the fact that the November 20, 2006 Hult letter was addressed to Mr. McCleve at Marshall Industries evidenced that confusion. Hult did not make this argument to the district court. Conse-

(continued...)

Hult's unambiguous acceptance of the Marshall letter assigning the Lease purchase option to McCleve and the McCleve letter's terms for exercising that option can be overcome by Hult's purported lack of actual intention to waive strict compliance with the Lease terms. *See generally id.* (requiring a waiver to be intentional, although it may be implied).

¶12   In the context of contract formation, the Utah appellate courts have held that "each party has the burden to read and understand the terms of a contract before he or she affixes his or her signature to it." *John Call Eng'g, Inc. v. Manti City Corp.*, 743 P.2d 1205, 1208 (Utah 1987) (reversing the trial court's determination that there was no "meeting of the minds" as a result of the city's failure to read the contract terms). "[S]ophisticated business parties are charged with knowledge of the terms of the contracts they enter into"; as a consequence, such parties are "not permitted to show that [they] did not know [a contract's] terms, and in the absence of fraud or mistake [they] will be bound by all its provisions, even [if they have] not read the agreement and do not know its contents." *ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2010 UT 65, ¶ 28, 245 P.3d 184 (citation and internal quotation marks omitted); *accord*

---

[2](...continued)
quently, it is unpreserved for our review. *See 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 ("[I]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue . . . . Issues that are not raised at trial are usually deemed waived." (alterations in original) (citations and internal quotation marks omitted)). In addition, we generally decline to consider an argument made for the first time during oral argument. *See, e.g., In re Gregory*, 2011 UT App 170, ¶ 10, 257 P.3d 495 (refusing to consider "unbriefed argument raised for the first time at oral argument").

*John Call Eng'g*, 743 P.2d at 1208 ("A party may not sign a contract and thereafter assert ignorance or failure to read the contract as a defense."); *cf. Copper State Leasing Co. v. Blacker Appliance & Furniture Co.*, 770 P.2d 88, 93 (Utah 1988) (explaining that, absent misrepresentation, a party to a contract has an obligation "to take reasonable steps to inform himself, and to protect his own interests" (citation and internal quotation marks omitted)).

¶13   These principles of contract formation and enforcement were applied in the waiver context in *ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2010 UT 65, 245 P.3d 184. In that case, the Utah Supreme Court considered whether the district court properly determined that the defendant, Wolf Mountain, had waived its right to assert an arbitration provision in the underlying contract. *Id.* ¶¶ 9, 26–31. Wolf Mountain contended that "it could not relinquish a 'known' right because it originally believed that it did not have the right to pursue arbitration." *Id.* ¶ 26. The supreme court disagreed, stating that the underlying contract contained a clear arbitration provision and that Wolf Mountain, as a "sophisticated business part[y]," could not claim its own misunderstanding or ignorance of the contract provision as a defense when its "actions . . . clearly manifest[ed] an intent to pursue litigation rather than arbitration." *Id.* ¶¶ 27–28, 31; *see also Geisdorf*, 972 P.2d at 68–69, 72–73 (holding that a landlord had not waived her right to strictly enforce a lease option agreement when she failed to notify the tenant that the renewal option could only be exercised in writing, based on its reasoning that the commercial lessee had an obligation to read the contract and take reasonable steps to protect his own interest). We do not see any reason why these principles would not be applicable to the analysis of waiver in the purchase option context.

¶14   Here, there is no dispute that the Lease clearly describes both the requirement that Marshall obtain the consent of Hult before making any assignment and the requirements for exercise

of the purchase option. Marshall's October 30, 2006 letter to Hult stated that Marshall had "assign[ed the] 'Option to Purchase' outlined in [the Lease] to McCleve Properties, LLC." And McCleve's own letter, dated October 31, 2006, reiterated that "Marshall Industries, Inc. has assigned this purchase option to McCleve Properties, Inc." and attached a copy of the assignment itself. At that point, Hult had unequivocal notice that the purchase option had been assigned and that the assignment had occurred without Hult's prior consent. McCleve's letter further informed Hult "that the purchase option is being exercised as per the [L]ease" to facilitate a section 1031 exchange, which had to "take place no later than March 31, 2007." The outer bounds of the closing period that McCleve thus described was clearly beyond the 120-day period in which the purchase transaction must be completed under the terms of the Lease. The two letters left no room for doubt that the purchase option had been assigned to McCleve and that McCleve was exercising the option.[3] Hult's written response was itself unambiguous, noting no objection to the assignment having been made without Hult's consent and unequivocally (though with some regret) acknowledging McCleve's exercise of the purchase option on the terms McCleve set forth. Indeed, Hult itself designated March—clearly beyond the option's 120-day closing period—as its preferred time frame for closing. By unequivocally acknowledging Marshall's assignment of the purchase option to McCleve, accepting McCleve's exercise of the option, and suggesting a closing date outside the 120-day

---

[3]Indeed, other than the claim, raised for the first time at oral argument, that Hult did not understand that Mr. McCleve was exercising the purchase option on behalf of McCleve Properties, LLC, and not as an agent for Marshall, Hult has not asserted that the Marshall or McCleve letters misled or deceived it about Marshall's and McCleve's intentions concerning the assignment and exercise of the purchase option.

closing window, Hult performed "intentional[] acts in a manner inconsistent with its contractual rights." *See Mid–America Pipeline Co.*, 2009 UT 43, ¶ 17. Furthermore, "as a result" of Hult's unambiguous acceptance of McCleve's terms for exercise of the purchase option, which did not conform to the requirements of the Lease, "prejudice accrue[d] to" McCleve when Hult later attempted to enforce the Lease as written. *See id.* Under these facts, the district court correctly determined that Hult had waived its right to strictly enforce the pertinent Lease provisions. Waiver eliminated Hult's defense to McCleve's breach of contract claims, rendering summary judgment in favor of McCleve appropriate. We therefore affirm the district court's summary judgment in favor of McCleve and denial of Hult's motion for summary judgment.

## II. Damages

¶15 We now consider the parties' claims regarding the district court's damages award.

A.    Income Tax Liability

¶16 Hult contends that the district court erred in awarding McCleve $52,096 in general damages for income taxes it owed as a result of the failed tax-deferred section 1031 exchange. Hult argues that such damages were not general damages, but consequential damages, which required a showing by McCleve that the damages were "within the contemplation of the parties at the time they contracted," *see Castillo v. Atlanta Gas Co.*, 939 P.2d 1204, 1209 (Utah Ct. App. 1997) (citation and internal quotation marks omitted). Hult contends that "any damages flowing from the failed exchange could not have been contemplated by the parties to the contract" because "the purported assignee of the contract wasn't a party to

the agreement when it was entered."[4] McCleve does not challenge Hult's contention that the income tax liability it incurred was more in the nature of consequential damages than general damages, but it nevertheless contends that the award was proper because Hult was told that McCleve planned to acquire the Premises as part of a section 1031 exchange when McCleve notified Hult of its intent to exercise the purchase option.

¶17    "Damages recoverable for breach of contract include both general [or direct] damages, *i.e.*, those flowing naturally from the breach, and consequential [or special] damages, *i.e.*, those reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985). In other words, general damages are "those resulting from the ordinary and obvious purpose of the contract," which in the case of an option agreement "would be the 'loss of the bargain' represented by the difference between the market value of the [property] and the option price." *Ranch Homes, Inc. v. Greater Park City Corp.*, 592 P.2d 620, 624 (Utah 1979); *see also* 22 Am. Jur. 2d *Damages* § 41 (2003) ("In contract cases, general damages are those that flow naturally from the breach of a contract . . . [and] include such items as loss of the bargain . . . ." (citations omitted)). By definition then, the category of general damages does not seem to include adverse tax consequences that stemmed from McCleve's inability to complete a planned section 1031 property exchange as a result of Hult's refusal to convey the

---

[4]Hult also asserts that McCleve did not actually incur any unexpected income taxes, as a section 1031 exchange merely defers the payment of taxes, rather than eliminate them. Hult does not make an argument for reversing the damages award on that basis, however, but instead asserts that McCleve's "mischaracterization" of the tax consequences of a section 1031 exchange "is actually irrelevant" to this appeal.

Premises after McCleve exercised the purchase option. Rather, such damages "arise from the special circumstances of the case" and are therefore consequential or special damages. *Ranch Homes*, 592 P.2d at 624; *see also* 22 Am. Jur. 2d *Damages* § 41 ("Special damages, on the other hand, are other foreseeable damages within the reasonable contemplation of the parties at the time the contract was made . . . [and] flow . . . from unusual circumstances which were known to the parties when they contracted." (citation omitted)).

¶18   Therefore, to recover its tax losses as consequential damages, McCleve had to prove "(1) that [the tax loss] damages were caused by the contract breach; (2) that [those] damages ought to be allowed because they were foreseeable at the time the parties contracted; and (3) the amount of consequential damages within a reasonable certainty." *See Mahmood v. Ross*, 1999 UT 104, ¶ 20, 990 P.2d 933. Although the briefing suggests that McCleve satisfied its burden as to the first and third factors, the parties present conflicting facts on the question of whether McCleve's tax liability was foreseeable at the time the parties contracted. *See Ranch Homes*, 592 P.2d at 624 (explaining that for damages to be foreseeable, "[m]ere knowledge of possible harm is not enough; the defendant must have reason to foresee, as a probable result of the breach, the damages claimed"). And because the district court awarded the tax liability as general damages, it did not undertake any analysis of foreseeability in its written minute entries or order regarding damages. Without any findings relating to the foreseeability of the tax consequences if Hult failed to perform the purchase option agreement, this court is not equipped to assess the propriety of the award for tax liability as consequential damages. Accordingly, we remand the case to the district court for the limited purpose of assessing whether McCleve's tax liability as a consequence of the failed 1031 exchange ought to be assessed against Hult as consequential damages.

¶19   On remand, the district court will likely be presented with the question of *when* the contemplation of tax consequences from a failed option contract had to occur in order to meet the foreseeability prong of the consequential damages analysis. For example, must the kind of loss McCleve suffered in connection with the exercise of the option agreement have been foreseeable to Marshall and Hult at the time they entered into the Lease or only at the time McCleve sought to exercise the purchase option? Ordinarily, we would endeavor to provide the district court with guidance on a legal issue likely to arise on remand. *See Wilson v. IHC Hosps., Inc.*, 2012 UT 43, ¶ 79, 289 P.3d 369. Neither party, however, has addressed this question in briefing, and we therefore believe it is better to leave this issue for the district court to address in the first instance based on appropriate briefing by the parties. *See State v. James*, 819 P.2d 781, 795 (Utah 1991) (noting that appellate courts only provide guidance for purposes of remand on "[i]ssues that are *fully briefed*" (emphasis added)); *Medley v. Medley*, 2004 UT App 179, ¶ 11 n.6, 93 P.3d 847 (declining, "in the exercise of judicial discipline—if not judicial economy—" to provide guidance on remand where there was "no consensus" on "what any such guidance should be"). Accordingly, we remand to the district court for factual and legal determinations on this issue.

B.    Loss of Use of the Premises

¶20   McCleve challenges the district court's denial of damages for its loss of use of the Premises as consequential damages. Specifically, McCleve requested $63,738 in compensation for "positive cash flow from rents [it would have] received" had the conveyance occurred as scheduled in March 2007. To support its claim, McCleve attached to its damages memorandum a chart, in which it quantified the monthly net "positive cash flow" it had expected to receive each month after making a "hypothetical loan payment" and collecting rent. McCleve did not offer any factual basis or other foundation for the rental rate or other figures it

presented. The district court, in its written ruling, declined to award McCleve damages for the loss of use of the Premises because it failed to "produce a sufficient evidentiary basis to establish the fact of damages" when it "provided [only] a computer generated table, listing a hypothetical loan payment and principal and interest based on the hypothetical loan" without "any foundation for . . . the hypothetical information." (Citation omitted.)

¶21    McCleve now challenges the district court's ruling on the basis that its damages were foreseeable at the time the contract was made and reasonably certain. The district court's ruling, however, rejected McCleve's claim not because the loss of use damages it claimed were not recoverable as consequential damages, but because McCleve failed to provide an evidentiary foundation for those damages. Because McCleve failed to challenge the basis of the court's ruling and because such an evidentiary decision appears to be within the court's discretion, we affirm the court's denial of the loss of use damages. *See generally Benns v. Career Serv. Review Office*, 2011 UT App 362, ¶ 2, 264 P.3d 563 (per curiam) ("If an appellant does not challenge the lower court's basis for its judgment, the lower court's determination is placed beyond the reach of further appellate review . . . ."); *State v. Burke*, 2011 UT App 168, ¶ 17, 256 P.3d 1102 ("A trial court's determination that there was [or was not] a proper foundation for the admission of evidence . . . [is reviewed for] an abuse of discretion." (omission and second alteration in original) (citation and internal quotation marks omitted)).

C.    Amortization

¶22    Finally, McCleve contends that the district court inappropriately denied its claim for consequential damages resulting from the loss of amortization benefits it would have enjoyed had the sale occurred in March 2007 rather than sixteen

months later as it actually did. According to McCleve, because "[a] portion of the loan payments amortizes the unpaid principal of the loan, reducing the amount of the loan each month," it would have reduced its total loan balance by $15,824 between March 2007, when the sale should have occurred, and July 2008, when the sale actually took place. McCleve, however, has not lost any of the benefit of amortization but merely has had the benefit delayed, i.e., it reduced the loan balance and built up equity between July 2008 and November 2009 as it would have between March 2007 and July 2008. Even if such damages were recoverable in principle, an issue that we do not decide, McCleve did not provide any evidence to the district court to demonstrate any loss caused by the delay, for example that the later interest rate was higher or even that there was a net loss based on present value principles. We therefore affirm the district court's denial of amortization damages.

## III. Conclusion

¶23    In summary, Hult unambiguously accepted McCleve's clear statement that it would exercise the Lease's purchase option, which was assigned to it by Marshall, and suggested a closing date outside the time frame contemplated by the Lease. This conduct evidenced Hult's intent to waive strict compliance with the Lease provisions. Thus, there were no material facts in dispute regarding Hult's breach of the contract, and summary judgment was properly awarded to McCleve.

¶24    We reverse the award of income tax damages to McCleve because the court analyzed their appropriateness under the general damages standard and remand for consideration under the consequential damages standard. Other damages to McCleve were appropriately denied where McCleve failed to provide an evidentiary basis for the loss of use damages and the amortization benefits of purchasing the Premises were merely delayed, rather than lost.

————