**2025 UT App 102**

THE UTAH COURT OF APPEALS

VIVINT SOLAR, INC.,
Appellant,
*v.*
JIM LUNDBERG,
Appellee.

Opinion
No. 20230335-CA
Filed July 3, 2025

Third District Court, Salt Lake Department
The Honorable Richard D. McKelvie
No. 200907106

Peggy A. Tomsic, Jennifer Fraser Parrish, and
Geoffrey K. Biehn, Attorneys for Appellant

Alan C. Bradshaw and Mitch M. Longson, Attorneys
for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

LUTHY, Judge:

¶1     Jim Lundberg left Vivint Solar, Inc. (Solar) as its associate general counsel after receiving multiple awards of nonrestricted stock options and restricted stock units from Solar. When he left Solar, Lundberg began working for Vivint Smart Home, Inc. (Smart Home), believing that his nonrestricted stock options and restricted stock units would continue to vest. However, when he asked Solar to deliver the stock underlying those equity awards, Solar informed Lundberg that it had canceled the awards when he left Solar for Smart Home.

¶2     After nearly two years of ensuing litigation of claims and counterclaims related to the equity awards—which claims were

subject to forum selection agreements requiring litigation of the claims in Utah and Delaware courts—Solar filed an arbitration demand alleging claims of attorney malpractice against Lundberg and citing a mandatory arbitration provision from Lundberg's separate employment contract with Solar. Lundberg responded by arguing that Solar's litigation of the equity award claims for nearly two years acted as a waiver of its contractual right to arbitrate its malpractice claims. The district court agreed and issued an order precluding arbitration of Solar's malpractice claims.

¶3    Solar now appeals, urging four reasons for reversal of the district court's order. Because we are unpersuaded by any of Solar's arguments, we affirm the order.

## BACKGROUND

### *313 Acquisition Acquires Solar and Smart Home and Lundberg Begins Working for Solar*

¶4    In 2012, 313 Acquisition, LLC (313 Acquisition) became the majority owner of both Solar and Smart Home. In May 2014, under the terms of a written employment agreement, Solar hired Lundberg as its associate general counsel. The employment agreement included an incentive in the form of a potential grant to Lundberg of a nonqualified stock option[1] to purchase 30,000 shares of Solar stock.

---

1. "A non-qualified stock option (NSO) is a type of employee stock option that allows an employee to purchase company shares at a set price (also known as the grant price) within a specified period." James Chen, *What Is a Non-Qualified Stock Option (NSO) and How Is It Used?*, Investopedia, https://www.investopedia.com/terms/n/nso.asp [https://perma.cc/G3MM-J2WV].

*The First Equity Award and the 2013 Plan*

¶5    In July 2014, Lundberg received the nonqualified option to purchase 30,000 shares of Solar common stock (the First Equity Award). The First Equity Award was governed by Solar's 2013 Omnibus Incentive Plan and an accompanying nonqualified stock option agreement (collectively, the 2013 Plan). Under the 2013 Plan, as long as Solar met certain performance benchmarks (which it apparently did), the First Equity Award would fully vest in 2019 if at that time Lundberg remained an "individual employed by [Solar] or an Affiliate." If he ceased to be "employed" by Solar or an "Affiliate" before the First Equity Award vested, Lundberg would forfeit the award. The 2013 Plan defined "Affiliate" to include "any corporation, trade or business [wherein] 50% or more of the combined voting power of such entity's outstanding securities [was] directly or indirectly controlled by [Solar] or any . . . Parent Corporation." And "Parent Corporation" was defined to include a corporation that owned "50 percent or more of the total combined voting power of all classes of stock" in another corporation. The 2013 Plan also contained the following forum selection provision: "Any suit, action or proceeding with respect to this Plan . . . shall be brought exclusively in any court of competent jurisdiction in Salt Lake City, Utah."

*The New Employment Agreement*

¶6    In September 2014, Lundberg signed a new employment agreement with Solar (the Employment Agreement). Under the Employment Agreement, Solar and Lundberg agreed that "any and all controversies, claims, or disputes . . . arising out of, relating to, or resulting from [Lundberg's] employment with [Solar] . . . [would] be subject to binding arbitration." Lundberg and Solar further agreed that the provisions of the Employment Agreement, including the arbitration provision, would "survive the termination of [Lundberg's] employment with [Solar]."

*The Second and Third Equity Awards and the 2014 Plan*

¶7    In April 2015, Lundberg received a second equity award from Solar, this time consisting of 7,632 restricted stock units[2] and a nonrestricted stock option to purchase 7,632 shares of Solar common stock (the Second Equity Award). And in May 2016, Lundberg received a third equity award, namely, 88,706 restricted stock units from Solar (the Third Equity Award). The Second and Third Equity Awards were issued pursuant to Solar's 2014 Equity Incentive Plan and associated nonqualified stock option and restricted stock unit agreements (collectively, the 2014 Plan). Under the 2014 Plan, the Second Equity Award would fully vest in May 2019 and the Third Equity Award would fully vest in May 2018, as long as Lundberg remained a "Service Provider" as of those dates. "Service Provider" was defined to include an "Employee," and "Employee" was defined to include "any person . . . employed by [Solar] or any member of the Company Group." "Company Group," in turn, was defined to mean "any entity that, from time to time and at the time of any determination, directly or indirectly . . . is under common control with [Solar]."

¶8    The 2014 Plan also contained the following forum selection provision:

> For purposes of litigating any dispute that arises under this Plan, a Participant's acceptance of an

---

2. "A restricted stock unit [(RSU)] is a type of compensation issued by an employer in the form of company stock. It is a promise of future stock in the company and not technically worth anything immediately. The RSU is converted to actual stock shares once the employee is fully vested through performance or length of time with the company." *What Is a Restricted Stock Unit (RSU) and How Does It Work? (With Example)*, Indeed, https://www.indeed.com/career-advice/career-development/rsu [https://perma.cc/3UZ7-ASG5].

Award is his or her consent to the jurisdiction of the State of Delaware, and [the Participant] agree[s] that any such litigation will be conducted in [the] Delaware Court of Chancery, or the federal courts for the United States for the District of Delaware, and no other courts, regardless of where a Participant's services are performed.

*Lundberg Leaves Solar for Smart Home and Attempts to Exercise His Stock Options*

¶9    Around August 2016, Lundberg left Solar and began working for Smart Home as its general counsel. About four years later, in early July 2020, Sunrun Inc. announced that it would be acquiring Solar. That announcement led to an increase in the market price of Solar stock. At the time of the announcement and until October 8, 2020, 313 Acquisition remained the majority owner of both Solar and Smart Home.

¶10    In late July 2020, Lundberg—who was still employed by Smart Home—wrote to Solar, asserting that he had "remained during all relevant time periods and through all applicable vesting dates an active 'Service Provider' with a member of the 'Company Group'" under the 2014 Plan and, therefore, that the restricted stock units from the Second and Third Equity Awards had vested. Lundberg then requested that the associated shares be delivered to him. Also in late July, and again in September 2020, Lundberg sent additional correspondence to Solar asserting that the nonqualified stock options granted him in the First and Second Equity Awards had also vested. He tendered the grant price of those options and asked that the shares be delivered to him.

*Solar Denies Lundberg's Requests*

¶11    Solar responded by denying all of Lundberg's equity award claims. It expressed its view that the nonqualified stock

options from the First and Second Equity Awards had not vested when Lundberg left Solar or, if they had vested, he had not exercised them within the applicable ninety-day exercise period after he left Solar. It similarly expressed the view that the restricted stock units from the Second and Third Equity Awards also had not vested when Lundberg left Solar. Solar then asserted that it and Smart Home were neither "Affiliates" as that term is used in the 2013 Plan nor members of the same "Company Group" as that term is used in the 2014 Plan. In its view, Lundberg had not been employed by an "Affiliate" or member of the same "Company Group" on the applicable vesting dates. Thus, Solar asserted that Lundberg had forfeited his equity awards. In further support of its position, Solar pointed to language in the 2013 Plan that it asserted gave its compensation committee "sole and plenary discretion and authority to interpret the [applicable] language" of the 2013 Plan. It likewise pointed to language in the 2014 Plan that it asserted also gave the compensation committee sole discretion to interpret the applicable language of the 2014 Plan and determine the effect of an employee's transfer from one member of the "Company Group" to another. On these bases, Solar told Lundberg that he had "no right to and [was] not entitled to receive" either the restricted stock units or the nonrestricted stock options, and it declined to deliver the associated stock to him.

*Lundberg Initiates Federal Court Litigation and Arbitration Proceedings Against Solar*

¶12    In late September 2020, Lundberg responded by suing Solar in federal court in Utah.[3] Then, in October 2020, citing the arbitration provision of the Employment Agreement, Lundberg

---

3. None of the federal court pleadings are included in the record before us, but the fact of Lundberg's filing the federal court action in September 2020, and of his later voluntary dismissal of that action, *see infra* ¶ 15, are included and undisputed in the record.

also initiated arbitration proceedings against Solar, asserting claims for breach of contract, breach of the covenant of good faith and fair dealing, conversion, negligent misrepresentation, fraudulent inducement, and violations of various federal securities laws.[4] In relation to his negligent misrepresentation and fraudulent inducement claims, Lundberg alleged that "[t]o the extent [Solar] . . . interpret[ed] the term 'Affiliate' under the 2013 and 2014 Plans such that [Solar was] not an affiliate or sister company of [Smart Home], or under the common control of a parent company," it had made knowingly false contrary statements to Lundberg while he was working for Solar. He further alleged that he reasonably relied on those contrary statements when he left Solar believing that "he would not forfeit his Equity Awards by transferring to [Smart Home]."

¶13 Solar filed a motion with the arbitrator, requesting dismissal of Lundberg's arbitration proceeding. It argued that the parties had not agreed to arbitrate Lundberg's breach of contract claims or his conversion claim. As to Lundberg's claims for negligent misrepresentation, fraudulent inducement, and federal securities law violations, Solar argued that Lundberg had failed to state a claim upon which relief could be granted.

*Solar Initiates Litigation in Utah and Delaware*

¶14 In November 2020 (apparently before the arbitrator ruled on Solar's motion to dismiss Lundberg's arbitration proceeding), Solar filed lawsuits against Lundberg in Utah state district court (the Utah case) and in the Delaware court of chancery (the

---

4. Lundberg's arbitration demand, as well as Solar's motion requesting its dismissal, *see infra* ¶ 13, are included, without objection, in the record here, as is the undisputed fact that Lundberg later agreed to stay the arbitration of his federal securities law claims, *see infra* ¶ 15.

Delaware case).[5] In those cases, Solar asserted claims for breach of the forum selection clauses of the 2013 Plan and the 2014 Plan, respectively, based on Lundberg having filed suit in federal court in Utah and having initiated arbitration proceedings. In both cases, Solar also sought a declaratory judgment: in the Utah case, it requested a judgment declaring that when Lundberg left Solar, he forfeited the nonrestricted stock options he had received in the First Equity Award; in the Delaware case, it requested a judgment declaring that when Lundberg left Solar, he forfeited the nonrestricted stock options and restricted stock units he had received in the Second and Third Equity Awards. Lundberg responded by filing breach of contract counterclaims in both cases.

---

5. While this appeal arises from the Utah case, a number of documents from the Delaware case were submitted, without objection, as exhibits to motions in the Utah case and, thus, appear in the record before us. Additionally, following oral argument in this appeal, Lundberg submitted a notice of supplemental authority under rule 24(j) of the Utah Rules of Appellate Procedure, attaching an unpublished memorandum decision containing the findings and conclusions of the Delaware court following a bench trial in that case. Solar responded to Lundberg's rule 24(j) notice by asserting that the notice itself was untimely and improperly addressed the merits of Solar's malpractice claims, and that the memorandum decision it identified is irrelevant. But Solar did not contest the authenticity of the memorandum decision, and the memorandum decision has been separately reported by Westlaw as well, *see Vivint Solar, Inc. v. Lundberg*, No. 2020-0988, 2024 WL 2755380 (Del. Ch. May 30, 2024). Thus, we rely on the Delaware court's memorandum decision and the documents from the Delaware case that appear in the record for the facts recited herein regarding the Delaware case.

¶15    Early in the Delaware case, Solar sought and obtained an injunction prohibiting Lundberg from pursuing his state law claims in arbitration. Lundberg then agreed to stay the arbitration of his federal securities law claims, he dismissed his federal case, and the parties proceeded to litigate the Delaware and Utah cases. Over the next year and more, the parties engaged in substantial discovery, deposing at least ten witnesses (some more than once) and exchanging hundreds of pages of documents.

*The Delaware Case*

¶16    The central issue in the Delaware case was whether under the 2014 Plan, Lundberg's Second and Third Equity Awards continued to vest after he left Solar and went to work for Smart Home. Solar took the position that those awards did not continue to vest because Smart Home was not a member of the defined "Company Group." Solar also took the position that under the 2014 Plan, decisions by its compensation committee regarding the 2014 Plan were authoritative and binding and that the compensation committee had authoritatively determined that once an employee ended employment with Solar, all of the employee's unvested equity awards would be canceled. As a defense to Lundberg's counterclaims, Solar asserted that, based on when Lundberg learned his equity awards had been canceled, his claims were barred by laches and the applicable statute of limitations. Specifically, Solar alleged, among other things, that "[a]s former in-house counsel, Lundberg . . . knew before he received any provisional, unvested [restricted stock unit awards] or unvested [s]tock [o]ption [a]wards that [Smart Home] was not included within the term 'Company Group' under the 2014 Plan" and that "Lundberg, as [Solar's] in-house counsel, was aware that the [compensation committee's] interpretation and administration of the 2014 Plan . . . was to cancel/terminate unvested equity awards upon a [Solar] employee's termination of employment with [Solar]."

¶17 Lundberg maintained, first, that the Second and Third Equity Awards continued to vest after he left Solar because Smart Home was a member of the defined "Company Group." In response to Solar's view of its compensation committee's authority to interpret the 2014 Plan, he asserted that while the system used by the brokerage firm Solar contracted with to provide administrative services for the 2014 Plan automatically canceled the unvested portion of employees' equity awards when they left Solar, those automatic cancellations were not the product of a decision by Solar's compensation committee. Finally, in response to Solar's laches and statute of limitations defenses to his counterclaims, Lundberg asserted that he did not learn of Solar's interpretation of the 2014 Plan and cancellation of his equity awards until years after he left Solar.

¶18 In June 2023, the Delaware case proceeded to a bench trial.[6] After the trial, the Delaware court requested supplemental submissions, the last of which it received in January 2024. In mid-2024, the Delaware court issued its ruling. The Delaware court determined that Solar's reading of the term "Company Group" to include "only Solar or its subsidiaries" and not Smart Home was "not a reasonable one." In relation to Solar's argument that its compensation committee nevertheless made a binding decision to interpret the 2014 Plan as allowing for cancellation of employees' unvested equity awards when they left Solar, the court found the following:

---

6. This appeal from the Utah case was filed in April 2023. Thus, the trial in the Delaware case and the Delaware court's ruling following trial occurred while this appeal was pending. Because some aspects of the Delaware court's ruling are relevant to our analysis, we include them here.

- "Solar consistently employed a practice of terminating awards under the 2014 Plan when plan participants stopped working at Solar or one of its subsidiaries."

- "Solar's IPO Prospectus, the 2014 Plan Prospectus, and statements by Solar employees either directly confirm or do not contradict this practice."

- Language stating "that '[a]ll vesting shall be subject to your continued employment with [Solar] through applicable vesting dates'" was "used in the [award] offer letters . . . sent to employees" under the 2014 Plan.

- "Although Solar demonstrated a consistent practice of forfeiting unvested awards upon a recipient's termination of employment with Solar or its subsidiaries, [Solar] did not present any persuasive evidence that the [compensation committee] ever made a determination to this effect, either generally or in a specific instance. Indeed, the evidence revealed that no such decision [by the compensation committee] was made."

¶19   As to Solar's laches and statute of limitation defenses to Lundberg's counterclaims, the court received evidence of, among other things, dates when Lundberg logged in to his online account with the brokerage that administered the equity awards. Based on that evidence, the court found that "Lundberg knew no later than July 6, 2017, and likely much earlier, that Solar had not delivered" at least some of his vested restricted stock units, and it held that "[s]ome of Lundberg's counterclaims [were therefore] time-barred."

¶20   Ultimately, the Delaware court concluded that Lundberg's Second and Third Equity Awards continued to vest while he worked for Smart Home, that Solar therefore breached the 2014 Plan by refusing to deliver those vested awards, and that

Lundberg was entitled to damages for his non-time-barred counterclaims. The Delaware court determined that Lundberg violated the forum selection clause of the 2014 Plan when he initially filed his Delaware claims in federal court in Utah and when he initiated arbitration proceedings on those claims, but it held that an award of damages was not a cognizable remedy for breach of the forum selection clause.

*The Utah Case*

¶21    The parties' positions in the Utah case regarding the First Equity Award and the 2013 Plan largely mirror their positions in the Delaware case regarding the Second and Third Equity Awards and the 2014 Plan. In the Utah case, Solar contends that Smart Home is not an "Affiliate" of Solar under the 2013 Plan. It also contends that its compensation committee has "sole and absolute discretion to interpret language in and administer the 2013 Plan" and that "[f]rom the 2013 Plan's inception, the [compensation committee] has consistently interpreted and administered the 2013 Plan" to cancel "unvested equity awards upon a [Solar] employee's termination" of employment with Solar. Solar alleges that "[a]s [Solar's] in-house counsel, Lundberg knew that the [compensation committee] interpret[ed] and administer[ed] the 2013 Plan . . . by canceling/terminating unvested equity awards upon a [Solar] employee's termination" and that before leaving Solar, "Lundberg never raised any issue relating to the vesting of equity awards." And Solar again asserts laches and statute of limitation defenses to Lundberg's counterclaims.

¶22    For his part, Lundberg maintains that "Solar is an 'Affiliate' of [Smart Home] because both entities are under common control of 313 [Acquisition]" and, therefore, that his employment did not terminate under the 2013 Plan when he went to work for Smart Home. He further asserts that even if the compensation committee interpreted and administered the 2013 Plan to cancel all unvested equity awards when an employee left Solar, "the plain language

of the [2013] Plan, rather than the [compensation committee's] view of the Plan controls." Thus, Lundberg contends that the nonqualified stock options he received in the First Equity Award vested and that Solar breached its agreement under the 2013 Plan by not delivering the associated stock to him.

¶23   In March 2021, Lundberg moved for summary judgment on his counterclaims, and Solar opposed the motion. The district court denied Lundberg's motion, ruling that the 2013 Plan "leaves to the discretion of the [c]ompensation [c]ommittee the interpretation of the 2013 Plan unless otherwise provided therein," that "the term 'Affiliate' in the 2013 Plan [is] ambiguous," and that "there exist genuine issues of material fact regarding whether the [c]ompensation [c]ommittee acted within [its] discretion in interpreting the Plan to foreclose Lundberg's exercise of the stock options."

¶24   In June 2022, as discovery continued, the parties attempted mediation but were unable to reach a settlement.

*The Arbitration Demand*

¶25   The next month, July 2022, relying on the arbitration provision of the Employment Agreement, Solar filed an arbitration demand (the Arbitration Demand). In the Arbitration Demand, Solar asserted claims against Lundberg for attorney malpractice allegedly committed while he was employed as Solar's associate general counsel. Specifically, Solar alleged that "from the inception" of the 2013 and 2014 Plans, it had interpreted and administered those plans to "require employees [who had been] granted unvested equity awards to remain employed with [Solar] through all applicable vesting dates for the equity awards to vest"; to therefore "deem as forfeited . . . an employee's unvested equity awards upon the termination of employment with [Solar]"; and to "trigger the exercise period for an employee's vested stock option awards upon employment termination." It also alleged that "[b]efore becoming employed by

[Solar] and throughout his employment with [Solar], Lundberg knew about and agreed to [Solar's] interpretation/administration of the Plans." Solar then alleged that it had "recently learned," while deposing Lundberg in July 2021, that

> Lundberg, in reviewing and analyzing the Plans in 2015 . . . , determined that, in his view as [Solar's] lawyer, the definition of "Affiliate" in the 2013 Plan and the definition of "Company Group" in the 2014 Plan were potentially ambiguous and subject to a potential counterinterpretation that would allow a [Solar] employee's unvested equity award to continue to vest . . . if an employee terminated employment with [Solar] and went to work for [Smart Home].

Solar asserted that Lundberg's "counterinterpretations created substantial financial risk for [Solar]" that "Lundberg had a fiduciary duty to disclose and not conceal." Based on these and other allegations, Solar asserted causes of action for breach of fiduciary duty, fraudulent nondisclosure, and breach of duties owed to a former client (Solar's malpractice claims). As damages, Solar claimed "any judgment rendered against [Solar] in any of the litigation by Lundberg, and attorney fees and costs to defend against Lundberg's actions and to prosecute [the Arbitration Demand]."

¶26   In the Utah case, Lundberg filed a motion to stay any proceedings under the Arbitration Demand. In that motion, Lundberg argued alternatively that Solar's malpractice claims are not arbitrable; that the Arbitration Demand constituted improper claim splitting; and that by litigating the claims related to the equity awards in the Utah and Delaware cases for nearly two years, Solar waived any right it had to arbitrate its malpractice claims. Solar disputed each of Lundberg's arguments.

¶27    Based on Lundberg's motion, Solar's response, and the documentary record before it, the district court granted Lundberg's motion to stay. It disagreed with Lundberg's assertions that Solar's malpractice claims are not arbitrable and that the Arbitration Demand constituted improper claim splitting. But it agreed with Lundberg's assertion that Solar waived its right to arbitrate its malpractice claims by litigating the equity award claims in the Utah case and the Delaware case for nearly two years. Thus, the court issued an order "preclud[ing] [Solar] from proceeding with [the] Arbitration Demand." Solar now appeals from that order. *See generally* Utah Code § 78B-11-129 (allowing for an appeal to "be taken from . . . an order granting a motion to stay arbitration").

ISSUE AND STANDARD OF REVIEW

¶28    On appeal, Solar contends that the district court erred by ruling that Solar substantially participated in litigation to a point inconsistent with arbitration of its malpractice claims and granting Lundberg's motion to stay arbitration on that basis. When, as here, a district court grants a motion to stay arbitration based on documentary evidence alone, we review that decision for correctness. *See ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2010 UT 65, ¶ 11, 245 P.3d 184 ("[W]hen a district court denies a motion to compel arbitration based on documentary evidence alone, it is a legal conclusion that is reviewed for correctness."); *Turpin v. Valley Obstetrics & Gynecology*, 2021 UT App 12, ¶ 17, 482 P.3d 831 ("[B]ecause the district court's substantial participation determination was made based on documents alone, we review its decision for correctness.").[7]

_____

7. Lundberg has not appealed the district court's rulings that Solar's malpractice claims are not arbitrable and that the Arbitration Demand constitutes improper claim splitting. He

(continued…)

ANALYSIS

¶29 The district court determined that while Solar's malpractice claims are arbitrable under the Employment Agreement's arbitration clause, Solar waived its right to arbitrate those claims. Our supreme court "has recognized the important public policy behind enforcing arbitration agreements as an approved, practical, and inexpensive means of settling disputes and easing court congestion." *Cedar Surgery Center, LLC v. Bonelli*, 2004 UT 58, ¶ 14, 96 P.3d 911 (cleaned up). In light of that policy, our supreme court has "also acknowledged that there is a strong presumption against waiver of the right to arbitrate." *Id.* (cleaned up). Consistent with those principles, "a court may infer [such a] waiver only if the facts demonstrate that the party seeking to enforce arbitration intended to disregard its right to arbitrate." *Id.* (cleaned up). Hence, to establish waiver of the right to arbitrate, a party must show "(1) that the party seeking arbitration substantially participated in the underlying litigation to a point inconsistent with the intent to arbitrate; and (2) that this participation resulted in prejudice to the opposing party."[8] *Id.*

---

does, however, renew his arguments regarding claim splitting and the arbitrability of Solar's malpractice claims as alternative bases for affirming the district court's ultimate determination to preclude proceedings under the Arbitration Demand. Because we affirm the district court's decision on the basis that Solar waived its right to arbitrate its malpractice claims, we do not address Lundberg's alternative arguments for affirmance.

8. Solar observes that in *Mounteer Enterprises, Inc. v. Homeowners Ass'n for the Colony at White Pine Canyon*, 2018 UT 23, 422 P.3d 809, our supreme court "repudiate[d] the requirement of proof of prejudice as an element of waiver" generally. *Id.* ¶ 33. Solar asserts that *Mounteer* thus "call[s] into question the continued viability of

(continued…)

¶30 Here, the district court relied on *Nelson v. Liberty Acquisitions Servicing, LLC*, 2016 UT App 92, 374 P.3d 27, in deciding that Solar substantially participated in underlying litigation to a point inconsistent with the intent to arbitrate. In *Nelson*, a debt collection company had previously filed and pursued debt collection actions against two individuals. *See id.* ¶¶ 1–2. One of those actions had resulted in dismissal of the company's claim on statute of limitation grounds. *See id.* ¶ 3. The other was ultimately resolved through a stipulated dismissal. *See id.* ¶ 4. The defendants from the debt collection actions then filed a complaint against the collection company, alleging that it had "violated the federal Fair Debt Collection Practices Act (the FDCPA) and the Utah Consumer Sales Practices Act (the UCSPA) by filing the [c]ollection [a]ctions despite the expiry of the time bar" for bringing such actions. *Id.* ¶ 5.

¶31 Pointing to account agreements that contained arbitration clauses, the collection company filed a motion to compel

---

[the] second prong" of the test for waiver of the right to arbitrate. We made the same observation in *Turpin v. Valley Obstetrics & Gynecology*, 2021 UT App 12, 482 P.3d 831, but noted that *Mounteer* "was not an arbitration case" and that the court in *Mounteer* "did not specifically address whether prejudice remains an element" of the test for waiver of the right to arbitrate. *Id.* ¶ 28 n.10. "Because the parties [in *Turpin*] did not raise this issue in the district court or on appeal, we consider[ed] it waived and assume[d] for purposes of our review that the prejudice prong still applie[d] in the . . . context [of waiver of the right to arbitrate]." *Id.* But we "flag[ged] the issue for possible exploration in a future case." *Id.* This is not that case. While Solar has flagged the potential issue, it has not actually challenged the continued viability of the second prong of the waiver test in this context. Neither has Lundberg. Thus, we again assume its continued viability and again flag the issue for possible exploration in a future case.

arbitration of the debtors' FDCPA and UCSPA claims. *See id.* ¶ 6. The debtors "opposed the motion to compel arbitration, arguing[,] among other things," that the company had "waived the right to arbitration by forgoing arbitration and instead filing and pursuing the [c]ollection [a]ctions in court." *Id.* ¶ 7. The district court denied the motion, ruling that, "having chosen to pursue litigation in [the] collection actions, [the collection company] waived the right to assert the arbitration provision against the [debtors] in the [FDCPA/UCSPA] case." *Id.* ¶ 8 (cleaned up). The collection company appealed. *See id.*

¶32    On appeal, the collection company argued that it could not have intentionally and knowingly waived its right to arbitrate the FDCPA and UCSPA claims by litigating the collection actions because the FDCPA and UCSPA claims "did not exist, and . . . were not raised, asserted or at issue in the prior collection actions." *Id.* ¶ 10 (cleaned up). This court disagreed. *See id.* ¶¶ 13–20. We first noted that if the collection company "filed time-barred collection actions," as the debtors alleged, then the "FDCPA and UCSPA violation claims did not just exist at the time of the [c]ollection [a]ctions but were in fact created by the filing of the [c]ollection [a]ctions." *Id.* ¶ 13.

¶33    We then acknowledged that the claims litigated in the collection actions were different from the claims at issue in the FDCPA/UCSPA action and that this raised a question as to whether the collection actions qualified as "underlying litigation" for purposes of determining waiver of the parties' contractual right to arbitrate the FDCPA and UCSPA claims. *See id.* ¶ 14. Resolving that question, we held that "the relevant inquiry is not simply whether the later claim was separate or distinct from the earlier claim." *Id.* ¶ 15. Instead, we indicated that courts should "weigh the relationship of the earlier claims to the later claims" and determine whether the "matters raised" in the earlier claims "are intertwined with the issues raised" in the later claims. *Id.* ¶ 19 (cleaned up). We concluded that "where a court determines that

[the later] claims are not based on the underlying litigation, a waiver of the right to arbitrate the prior claims does not effect a waiver as to the [later] claims." *Id.* ¶ 18. But because "the applicability and effect of the time-bar [to the collection claims] was at issue" in both the collection actions and the FDCPA/UCSPA action, we determined that the collection actions did qualify as "underlying litigation" and that the collection company's pursuit of that litigation acted as a waiver of its right to arbitrate the FDCPA and UCSPA claims. *See id.* ¶¶ 13, 19–20.

¶34 In the instant case, the district court deemed the parties' litigation of the equity award claims to be "underlying litigation" to Solar's malpractice claims, explaining:

> [Solar] chose to litigate, both in Utah and Delaware, its claims regarding the stock agreements between [Solar] and [Lundberg] set forth in the 2013 and 2014 Plans respectively. Indeed, [Lundberg] filed an [a]rbitration [d]emand with regard to claims based on the Plans, to which [Solar] objected—arguing that while the securities claims were subject to arbitration, the claims based on the Plans themselves were not.
>
> . . . .
>
> [Now in the] Arbitration Demand, [Solar] alleges that [Lundberg] knew of the potential ambiguity in the 2013 Plan language and failed to inform [Solar] of the same in violation of duties [he] owed [Solar] as counsel. These claims are inextricably intertwined with the claims currently pending before this [c]ourt. Indeed, [Solar] claims any damages awarded against it in the present matter as a measure of damages in the arbitration proceeding. Furthermore, it is [Lundberg's] alleged understanding of the 2013 Plan—the very plan at

> issue in the present matter—that forms the basis of the claims [Solar] alleges in the Arbitration Demand. The foregoing, taken together, establishes that the outcome of the claims [Solar] has asserted in the Arbitration Demand are almost entirely dependent on the outcome of the present action. Accordingly, the [c]ourt finds that the present litigation is properly considered the underlying litigation for the purpose of the waiver analysis.

The court then held that Solar participated in the underlying litigation to a point inconsistent with the intent to arbitrate its malpractice claims and that Lundberg would suffer prejudice if Solar were permitted to arbitrate its malpractice claims.

¶35 Solar expressly "does *not* dispute that a court may consider litigation in other proceedings outside of the actual case being appealed as the 'underlying litigation for the purpose of the waiver analysis,' and that in doing so, a court may consider the interrelatedness of the claims." Solar also "does not challenge . . . on appeal" the district court's prejudice determination under the second prong of the waiver test. Nor does Solar make any argument against the district court's determination that the extent of the litigation in the Utah and Delaware cases is otherwise inconsistent with an intent to arbitrate. Solar makes four other arguments instead.

¶36 First, it contends that the district court "erred when it found [Solar's] prior litigation with Lundberg was conduct that evinced *unequivocally* an intent to waive its right to arbitration and was inconsistent with any other intent," where Solar "was contractually required to litigate its claims in the forums specified by the parties' agreements, to the exclusion of all other forums." Second, Solar suggests that the district court erred by determining that the equity award claims in the Utah and Delaware cases are sufficiently intertwined with Solar's malpractice claims to qualify

the Utah and Delaware cases as "underlying litigation" for purposes of a waiver analysis. Third, Solar maintains that it did not know "all the facts necessary to allege [its malpractice claims] in 2020 when [the Utah and Delaware cases] started," suggesting that it could not waive the right to arbitrate claims it did not know it had. Finally, Solar asks us to adopt a rule requiring, as "a mandatory factual predicate" for a finding of waiver based on participation in underlying litigation, that the underlying litigation involve claims subject to a contractual arbitration provision. We address and reject, in turn, each of Solar's arguments.

### I. Solar's Ability to Arbitrate the Equity Award Claims

¶37    Solar "takes issue" with the district court's "statement that [Solar] 'chose' to bring [its equity award claims] in Utah and Delaware, to the extent [that] the [d]istrict [c]ourt implies that [Solar] 'chose' to litigate these claims versus bringing them in arbitration." Solar maintains that the parties' equity award claims "were contractually barred from being arbitrated, as they were subject to contractual [forum selection] provisions [in the 2013 Plan and 2014 Plan] mandating the exclusive jurisdiction of courts in Salt Lake City and Delaware." "As a matter of law (and logic)," Solar argues, it "could not have waived the right to arbitrate these claims, as [it] had no right to arbitrate them in the first place." To conclude otherwise, Solar asserts, would "throw[] the parties' freedom to contract out the window." (Citing *Utah Transit Authority v. Greyhound Lines, Inc.*, 2015 UT 53, ¶ 31, 355 P.3d 947 (stating that, generally, "we should recognize and honor the right of persons to contract freely and to make real and genuine mistakes when dealings are at arms' length" (cleaned up)).) Solar is mistaken.

¶38    "It is fundamental that where parties have rights under an existing contract[,] they have exactly the same power to . . . waive such rights as they had to make the contract in the first place."

*Cheney v. Rucker*, 381 P.2d 86, 89 (Utah 1963). Here, prior to Solar filing the Utah and Delaware cases, Lundberg waived his rights under the forum selection provisions of the 2013 and 2014 Plans by filing his own arbitration demand that included his equity award claims. At that point, Solar was free to likewise waive the forum selection provisions of the 2013 and 2014 Plans and participate in arbitration. The fact that it chose not to join Lundberg and waive its right to litigate the equity award claims does not mean that it was bound to litigate those claims. Rather, the district court was correct: "[Solar] chose to litigate, both in Utah and in Delaware, its claims regarding the stock agreements between [Solar] and [Lundberg] set forth in the 2013 and 2014 Plans." We therefore reject Solar's argument that the district court erred in making that determination.

## II. Sufficient Intertwining of the Utah and Delaware Case Claims and Solar's Malpractice Claims

¶39 Next, Solar asserts that the district court erred by determining that the equity award claims in the Utah and Delaware cases are sufficiently intertwined with Solar's malpractice claims to qualify the Utah and Delaware cases as "underlying litigation" for purposes of a waiver analysis. Specifically, Solar does not agree with the district court's determination that the outcome of Solar's malpractice claims is "almost entirely dependent on the outcome of the [Utah and Delaware cases]." In this regard, Solar contends that "the pivotal question" in the Utah and Delaware cases is "What interpretation of the [relevant] Plan is correct—Solar's or Lundberg's?," while when it comes to Solar's malpractice claims, "nobody has to determine who's right" about how to interpret the Plans. Instead, Solar claims that the "only issue" raised by its malpractice claims is "When did [Lundberg] know he had a different viewpoint of how to interpret the [2013 and 2014 Plans] than Solar's [compensation committee]?" Solar contends that "[t]he only substantive impact a judgment in [the Utah case and the Delaware

case] will have on [Solar's malpractice claims] is to determine the extent of damages that [Solar] may seek."

¶40 Even if we were to agree with Solar that the outcome of its malpractice claims is not "almost entirely dependent" on the outcome of the equity claims in the Utah and Delaware cases, almost entirely dependent claims is not the standard established in *Nelson*. Rather, the standard from *Nelson* is whether the "matters raised" in the earlier claims "are intertwined with issues raised" in the later claims. *Nelson v. Liberty Acquisitions Servicing LLC*, 2016 UT App 92, ¶ 19, 374 P.3d 27 (cleaned up). And here, we conclude that the matters raised in the Utah and Delaware cases are sufficiently intertwined with the issues raised by Solar's malpractice claims to qualify the Utah and Delaware cases as underlying litigation for purposes of a waiver analysis.

¶41 Notwithstanding that the pivotal questions in the Utah and Delaware cases involve the correct interpretation of the 2013 and 2014 Plans, while the primary issue raised by Solar's malpractice claims is when Lundberg knew his interpretation of the Plans differed from the interpretation of the compensation committee, the matters are nevertheless legally intertwined. In the Delaware case, Solar asserted laches and statute of limitation defenses to Lundberg's breach of contract claims. In connection with those defenses, Solar alleged that Lundberg knew prior to leaving Solar of the compensation committee's purported interpretation of the 2014 Plan to not include Smart Home as a member of the "Company Group." It also alleged that Lundberg was aware prior to leaving Solar of the compensation committee's practice of canceling employees' unvested equity awards when they left Solar, even if the employees went to work for Smart Home. In turn, Lundberg alleged that he did not know of Solar's interpretation of the 2014 Plan or that Solar had canceled his equity awards until years after he left Solar. The parties produced conflicting evidence on these points, and the Delaware court then made specific findings, including about the practice of Solar

canceling employees' unvested equity awards upon their termination of employment with Solar; the language used by Solar to communicate vesting requirements to award recipients, including Lundberg; the lack of a decision by the compensation committee to interpret the 2014 Plan as Solar now interprets it; and a date by which Lundberg must have known that his equity awards had been canceled by the brokerage that administered the equity awards.

¶42 The parties have made similar allegations related to Solar's laches and statute of limitation defenses in the Utah case as well. Specifically, Solar alleges that as its in-house counsel, Lundberg knew of its compensation committee's interpretation of the 2013 Plan but "never raised any issue relating to the vesting of equity awards." In response, Lundberg denies those allegations but has testified in a deposition that he reached his own relevant interpretation of the 2013 Plan prior to leaving Solar. These allegations and the evidence related to them will require the court in the Utah case to also make findings on these matters.

¶43 The foregoing allegations, evidence, and findings in the Utah and Delaware cases regarding what Lundberg knew about Solar's interpretation of the 2013 and 2014 Plans and when he knew it has direct bearing on the malpractice claims Solar raises in the Arbitration Demand, which, as Solar itself explains, center on when Lundberg "[knew] he had a different viewpoint of how to interpret the [2013 and 2014 Plans] than Solar's [compensation committee]."

¶44 Additionally, as the district court determined and as Solar acknowledges, Solar asserts as damages under its malpractice claims any damages awarded against it in the Utah and Delaware cases. This provides another meaningful intertwining point between the Utah and Delaware cases and Solar's malpractice claims.

¶45 Moreover, because the claims in the Utah and Delaware cases arise from the same agreements, the same understandings about those agreements, and the same conduct related to those agreements as Solar's malpractice claims, the general facts and fact discovery applicable to each set of claims are largely overlapping. This reality further reflects a significant intertwining between the Utah and Delaware cases on the one hand and Solar's malpractice claims on the other.

¶46 Based on the foregoing, we conclude that the district court did not err in determining that the Utah and Delaware cases are sufficiently intertwined with Solar's malpractice claims to qualify the Utah and Delaware cases as underlying litigation for purposes of an arbitration waiver analysis.

### III. Solar's Knowledge of Its Malpractice Claims

¶47 Solar also maintains that it did not know "all the facts necessary to allege [its malpractice claims] in 2020 when [the Utah and Delaware cases] started." Solar claims it became aware of its malpractice claims only when it deposed Lundberg in July 2021 and learned that "Lundberg, in reviewing and analyzing the Plans in 2015 . . . , determined that, in his view as [Solar's] lawyer, the definition of 'Affiliate' in the 2013 Plan and the definition of 'Company Group' in the 2014 Plan were potentially ambiguous and subject to . . . potential counterinterpretation[s]." Solar thereby suggests that it could not have knowingly and intentionally waived the right to arbitrate claims of which it was unaware until July 2021 through litigation occurring in 2020 and the first half of 2021. However, not only did Solar wait until July 2022 to file the Arbitration Demand, but its assertions about when it became aware of its malpractice claims are belied by the record.

¶48 Solar has claimed all along that Lundberg knew of its interpretation of the terms "Affiliate" and "Company Group" while he served as Solar's in-house counsel. And Lundberg

alleged in his arbitration demand—which he filed in October 2020—that he relied on a contrary understanding of those terms when he left Solar believing that "he would not forfeit his Equity Awards by transferring to [Smart Home]." Thus, when Solar filed the Utah and Delaware cases in November 2020, it already knew the factual basis for its malpractice claims: namely, that while Lundberg was its in-house counsel, he was aware of both Solar's interpretation of the relevant terms in the 2013 and 2014 Plans and his own contrary interpretation of those terms and yet failed to inform Solar of the conflicting interpretations and their implications. Thus, we reject Solar's suggestion that it could not have knowingly and intentionally waived its right to arbitrate its malpractice claims because it was not initially aware of them.

### IV. Solar's Proposed Factual Predicate to a Determination of Waiver Based on Participation in Underlying Litigation

¶49    Finally, Solar asks us to adopt a rule requiring, as "a mandatory factual predicate" to a determination of waiver based on participation in underlying litigation, that the underlying litigation involve claims that are subject to a contractual arbitration provision. Under such a rule, because the equity award claims in the Utah and Delaware cases are not subject to a contractual agreement to arbitrate,[9] litigation of those claims in

---

9. In granting Solar's motion for an injunction prohibiting Lundberg from pursuing his state law claims in arbitration, and in ruling that Lundberg breached the forum selection clause of the 2014 Plan, the Delaware court necessarily concluded that the parties' equity award claims were not subject to the Employment Agreement's mandatory arbitration provision. For purposes of our analysis here, we accept the Delaware court's conclusion and assume a similar conclusion under the 2013 Plan without undertaking any independent analysis of the correctness of such conclusions.

the Utah and Delaware cases would not qualify as underlying litigation for purposes of determining whether Solar waived its contractual right to arbitrate its malpractice claims.

¶50    In support of such a rule, Solar points in its principal brief to this State's "strong public policy in favor of arbitration," *Chandler v. Blue Cross Blue Shield of Utah*, 833 P.2d 356, 358 (Utah 1992), and corresponding "strong presumption against waiver of the right to arbitrate," *Cedar Surgery Center, LLC v. Bonelli*, 2004 UT 58, ¶ 14, 96 P.3d 911 (cleaned up), as well as to our caselaw, wherein all cases holding that a party waived the right to arbitrate have involved underlying litigation of claims that were themselves subject to mandatory arbitration, *see, e.g.*, *Tomlinson v. NCR Corp.*, 2014 UT 55, ¶ 9 n.1, 345 P.3d 523; *Cedar Surgery Center*, 2004 UT 58, ¶ 22; *Chandler*, 833 P.2d at 361.

¶51    Solar conceded at oral argument, however, that the fact that our State's caselaw regarding waiver of the right to arbitrate has so far involved only underlying litigation of claims that were themselves subject to mandatory arbitration does not mean that our caselaw has resolved the unique issue presented here—namely, whether prior litigation of claims *not* subject to a contractual mandatory arbitration provision but intertwined with later claims that are subject to mandatory arbitration can qualify as underlying litigation for purposes of waiving arbitration. Thus, its argument for a rule requiring a factual predicate of claims in underlying litigation being themselves subject to an arbitration provision really rests exclusively on the general policy favoring arbitration and the corresponding presumption against finding waivers of arbitration. And we agree with Lundberg that our supreme court's decision in *ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2010 UT 65, 245 P.3d 184, forecloses adoption of such a rule on those grounds.

¶52    In *ASC Utah*, a landowner had been involved in extensive contract litigation for three years when it filed a motion for leave

"to add several new parties to the litigation." *Id.* ¶¶ 2–7. After the district court denied that motion, the landowner filed a demand for arbitration. *Id.* ¶ 8. The landowner acknowledged that it had been "fully aware of the [arbitration provision in the parties' contract] from the outset of the litigation." *Id.* But it argued that it had not waived its right to arbitrate because it had initially "interpret[ed] the [arbitration] provision as not allowing it to initiate arbitration." *Id.* ¶¶ 8–9. In other words, the landowner argued that it "did not know it had the right [to arbitrate] until the district court's . . . order denying [its] request to add new parties to the case" and that "it could not [have] relinquish[ed] a 'known' right [to arbitrate] because it originally believed that it did not have the right to pursue arbitration." *Id.* ¶ 26. Our supreme court rejected the landowner's argument. *See id.* ¶¶ 26–28.

¶53 The supreme court reasoned that the landowner "was clearly aware of the arbitration provision," "had the responsibility to understand all the [contract's] provisions . . . when it signed the [contract]," and, "[a]s a sophisticated business party, . . . [would be] charged with a knowledge of any potential right of arbitration [for purposes of] determining whether [it] waived the right to arbitration." *Id.* ¶¶ 27–28. Ultimately, the court concluded:

> Utah public policy favors arbitration agreements only insofar as they provide a speedy and inexpensive means of adjudicating disputes, and reduce strain on judicial resources. In this case, enforcing the arbitration agreement would undercut both policy rationales: arbitration at this point would be neither a speedy and inexpensive way to adjudicate this dispute, nor a means of reducing strain on judicial resources.

*Id.* ¶ 40.

¶54 Despite the unique fact here—that the equity award claims in the Utah and Delaware cases are not themselves subject to a

contractual arbitration provision—*ASC Utah*'s public policy-based conclusion applies equally in this context. Specifically, enforcement of the Employment Agreement's arbitration provision solely because the equity award claims in the Utah and Delaware cases are not themselves subject to a contractual arbitration provision would undercut both policy rationales that ordinarily favor enforcement of arbitration agreements. First, arbitration of Solar's malpractice claims at this point would not be a speedy and inexpensive way to reach global resolution of Solar's and Lundberg's intertwined claims. Rather, despite prior and imminent resolution of the Delaware and Utah cases respectively, the parties would just be embarking on the process of resolving Solar's malpractice claims—an outcome that could have been avoided if Solar had chosen at the outset to arbitrate all of the intertwining claims. And second, a holding requiring arbitration of Solar's malpractice claims at this point would not promote a reduced strain on judicial resources. Instead, it would allow, and in some cases incentivize, future parties not to consolidate and resolve such intertwining claims in a non-judicial forum. Thus, based on the limitations *ASC Utah* recognizes to the public policy that usually favors arbitration agreements, we decline to adopt Solar's proposed rule requiring that prior litigation involve claims subject to a contractual arbitration provision in order for that prior litigation to qualify as underlying litigation for purposes of waiving a contractual right to arbitrate later-asserted claims.

CONCLUSION

¶55    Solar was free to arbitrate, rather than litigate, the equity award claims. The equity award claims in the Utah case and Delaware case are sufficiently intertwined with Solar's malpractice claims to qualify the Utah and Delaware cases as "underlying litigation" for purposes of determining Solar's waiver of its contractual right to arbitrate its malpractice claims. Solar was aware of the factual basis for its malpractice claims

when it initiated the Utah and Delaware cases. And Solar's proposed rule requiring as a predicate to a determination of waiver based on participation in underlying litigation that the underlying litigation involve claims that are themselves subject to a contractual arbitration provision is at odds with our supreme court's decision in *ASC Utah, Inc. v. Wolf Mountain Resorts, LC,* 2010 UT 65, 245 P.3d 184. For these reasons, we affirm the district court's order precluding arbitration of Solar's malpractice claims.

———————